The inhabitants of the town of EAST-HAVEN *against* HEMING-WAY and others.

—

On the application of the proprietors and inhabitants of the town of *New-Haven,* for a patent of confirmation of the lands, both meadow and upland, with their appurtenances, within certain boundaries particularly specified, which they had obtained, by purchase, or otherwise lawfully, of the *Indian* native proprietors, and whereof they had stood seised, and in quiet possession, for many years then past without interruption, the General Assembly of the colony of *Connecticut,* in 1685, for a more full confirmation of the premises unto the said proprietors and inhabitants of the town of *New-Haven,* in their rightful possession and enjoyment of the same, gave, granted, ratified and confirmed unto them, their heirs successors and assigns, the premises so butted and bounded, together with all the meadows, pastures, swamps, upland and arable land, woods, islands, ponds, ways, waters, watercourses, havens, ports, rivers, fishings, huntings, fowlings, mines, minerals, quarries, precious stones, on or within the premises, and all other commodities, privileges, franchises and hereditaments whatsoever thereunto belonging, or in anywise appertaining to any part or parcel thereof. Within the boundaries of the premises was *Dragon* river, an arm of the sea, where the tide ebbs and flows, and navigable for large vessels. Held, 1. that this act of the General Assembly was not only a confirmation, but a grant, of title; but 2. that the soil between high and low water mark of *Dragon* river, was not thereby granted.

In 1640, the General Assembly of the colony of *New-Haven* granted to thirty-two individuals, for the purpose of *planting,* a tract of land on the *East* side of *Dragon* river, to be located, by the grantees, in separate lots, and to be held by them in severalty. One of these lots was located contiguous to the river, and bounded *Westerly* on the river, extending over a highway previously laid out on the *Eastern* bank above high water mark. Held, that this grant was not subject to a condition or qualification that the lots should be planted, according to the modern acceptation of that term; no more being intended, than that the land was conveyed to the grantees, that they might make a settlement thereon; and consequently, that they had good right to locate the grant in part on a highway, from which they might derive accommodation.

The proprietor of land adjoining to a navigable river, has an exclusive right to the soil between high and low water mark, for the purpose of erecting wharves and stores thereon.

THIS was an action of ejectment; tried at *New-Haven.* *January* term, 1827, before *Brainard,* J.

The demanded premises were the soil, with the wharf and store standing thereon, built between high and low water mark, on the *East* side of *Dragon* river. This river is an arm of the sea, where the tide ebbs and flows, and is navigable, adjoining the premises, for large vessels.

NewHaven, July, 1828.

East-Haven v. Hemingway.

The title claimed by the plaintiffs, was derived, 1. from the charter of *Charles* II. to the colony of *Connecticut*, in 1662; 2. from the patent, given by the colony, to the proprietors of *New-Haven*, in 1685; 3. from the act of incorporation of the village of *East-Haven*, in 1707, and the practical division between the proprietors of *New-Haven* and *East-Haven*, sanctioned in 1756; and 4. from the deed of cession, by the proprietors of *East-Haven*, to the town of *East-Haven*, in 1797, confirmed by a public act of the General Assembly, in 1825.

By the first-mentioned instrument, *Charles* II. gave, granted and confirmed to the colony all that part of his dominions within certain limits, " together with all firm lands, soils, grounds, havens, ports, rivers, waters, fishings, mines," &c.

The patent granted by the colony to the inhabitants and proprietors of the town of *New-Haven*, was dated the 6th of *January*, 1685, (a) [1686] and extended on *Long-Island* sound from the *Western* part of the present town of *Orange* to the *Western* part of the present town of *Branford*, including, of course, the place in question. This instrument begins with the following recitals: " Whereas the General Court of *Connecticut* colony have formerly granted unto proprietors, inhabitants of the town of *New Haven*, in the said colony, all those lands, both meadow and upland, with all their appurtenances within these abutments;" [specifying them] " the said lands and premises having been, by purchase or otherwise, lawfully obtained of *Indian* native proprietors, by the said proprietors and inhabitants of *New-Haven*:"

" And whereas the said proprietors and inhabitants of *New-Haven* have made application to the Governour and Company of the said colony of *Connecticut* assembled in General Court, the 14th of *May*, 1685, that they may have a patent for confirmation of the aforesaid lands and premises, so purchased, and granted unto them as aforesaid, whereof they have stood seised and in quiet possession, for many years past, without interruption."

(a) Our ancestors, at this period, began the year in *March*, and of course, this date, according to the present mode of reckoning time, would be 1686. *R.*

*NewHaven,*
July, 1828.

East-Haven
*v.*
Hemingway.

The patent then proceeds thus : " Now therefore, for a more full confirmation of the aforesaid tract or tracts of land and premises, so butted and bounded as before expressed, unto the said proprietors, the inhabitants of the aforesaid township of *New-Haven,* in their rightful possession and enjoyment of the same, KNOW YE, that the said Governour and Company assembled in General Court aforesaid, according to the power and commission granted unto them, by his late Majesty's gracious charter, have given and granted, and by these presents, do give, grant, ratify and confirm unto *James Bishop,* Esq., *William Jones,* Esq , &c. and to the rest of the present proprietors of the township of *New-Haven,* their heirs successors and assigns forever, all that parcel or tract or tracts of lands and premises, so butted and bounded as aforesaid, together with all the meadows, pastures, swamps, upland and arable land, woods, islands, ponds, ways, waters, water-courses, havens, ports, rivers, fishings, huntings, fowlings mines, minerals, quarries, precious stones on or within the said tracts of land, and all and singular other commodities, privileges, franchises and hereditaments whatsoever, thereunto belonging, or in any ways appertaining to any part or parcel thereof, within the said bounds and limits aforesaid."

On the petition of the inhabitants of the *East-Village* of *New-Haven,* the General Assembly of the colony, in *May,* 1707, enacted, that they should be a village distinct from the township of *New-Haven ;* and invested with all the immunities and privileges proper and necessary for a village, for the upholding the public worship of God, as also their own civil concerns ; and in order thereunto, the General Assembly granted the liberty of all such officers as are proper and necessary for a town, to be chosen by themselves, in the order and form provided by law for any town. *East-Haven,* thus constituted, extends *Westerly* to the channel of *Dragon* river, including the demanded premises within its limits.

Since the incorporation of *East-Haven* into a village, the proprietors of *New-Haven* residing in *New-Haven,* have ceased to exercise any acts of ownership over the common and undivided lands within the limits of *East-Haven ;* and the proprietors in *East-Haven* have, in sundry instances, disposed of the common and undivided lands within their own limits.

By an act or resolve of the General Assembly, in 1756, the proprietors of the common and undivided lands, living in the

village of *East-Haven*, were constituted a proprietary, a body
corporate, and, as such, owned, and had a right to dispose of,
all the common and undivided lands lying within the limits of
that village.

In *January*, 1740, the proprietors in *East-Haven* granted to
*Joseph Tuttle*, jr. and others, their heirs and assigns forever
the flats at a certain place within the limits of *East-Haven*,
sixty feet wide from high water mark down to the channel,
provided they should build a wharf, &c. ; also, to *John Wood-
ward* and others, their heirs and assigns forever, the flats at
another place, down to the channel, subject to a similar con-
dition.    At a meeting held in *February*, 1797, these proprietors
granted to *Enos Hemingway* and others the flats, 187 feet in
width, to the channel, for certain purposes specified in the
grant ; and in *March*, 1797, to the town of *East-Haven* all the
remaining right, which the grantors were entitled to in the flats
lying within the limits of that town.    The latter grant was
confirmed by the provisions of the act of 1825, *ch.* 11.

The proprietors in *New-Haven*, from 1710 to 1722, made
eight different grants of flats situated between *Tomlinson's*
bridge and the long wharf, within the limits of the present
town of *New-Haven*.    Neither *East-Haven*, nor any of the
proprietors living in *East-Haven*, after the year 1707, took any
part in any of the proceedings of the proprietors of *New-Ha-
ven* in relation to these flats (*a*)

The facts relied on in support of the defendants' title, are
the following.    The village of *Dragon* is built on each side of
the *Dragon* river, and is a place of considerable commerce,
having more than twenty vessels employed in trade, going to,
and returning from distant parts of the *United States*.    For
more than forty years past, proprietors of land adjoining *Dra-
gon* river, on each side, have, at pleasure, wharfed out into the
river below high water mark, to accommodate the trade of the
village and the public ; more than thirty valuable wharves hav-
ing been so built.    Neither the proprietors of *New-Haven* nor
of *East-Haven* have ever made any grant of flats, or of the
shore, on either side of the channel of *Dragon* river, nor ever

(*a*) There was other evidence of the same general character, introduced by
the plaintiffs, for the purpose of shewing a practical construction of the pa-
tent of 1685 favourable to their claim, which is omitted, for the two-fold rea-
son, that a detail of it would render the statement inconveniently prolix, and
that it is not necessary to present distinctly the points discussed and decided.

*NewHaven,* granted any licence to any person to build any wharf ; nor has
July, 1828. any application ever been made to them, for the purpose of
East-Haven procuring leave to build a wharf on any part of the river ; nor
*v.* have they, or the ancient proprietors, from the first settlement
Hemingway. of the country, ever exercised any act of ownership upon any
part of the river, or the soil under it, or made any claim to any
part of the shore, until the bringing of the present action.    The
demanded premises have always been an open and public
shore, and used, by the public, for the purpose of navigation
and fishing, excepting only the use which has been made of the
shore in question, by the defendants, and those whose estate
the defendants have.

On the basis of these facts, the defendants claimed, that if
the fee of the demanded premises were ever in the original
proprietors of common and undivided land, or in the plaintiffs,
the plaintiffs' right was long since abandoned and lost ; and the
defendants prayed the judge so to instruct the jury.

In the year 1640, the General Court of the colony of *New-
Haven* allotted to thirty-two individuals, for the purpose of
planting, a tract of land about one mile in length, on the *East*
side of *Dragon* river, extending from the farm of the Rev. Mr.
*Davenport* on the *North* to the *Indian* wigwams on the *South*,
embracing within its limits the land adjoining the demanded
premises, and a considerable tract next thereto above and be-
low.    This land was to be taken up and located, by the gran-
tees, in separate lots, to be held by each of them in severalty,
as his own proper estate in fee ; and the apportionment was to
be so made, that each individual, if single, should have four
acres, if he had a wife, six acres, and one acre more for each
child belonging to his family    The lots so taken and appropri-
ated were called *Dragon* lots.    One of these lots was opposite
the demanded premises, on the *Eastern* side of *Dragon* river,
and bounded *Westerly* on this river; to which the defendants
claim title as heirs to *Gershom Brown,* who purchased it from
the heirs of the original proprietor.

The defendants claimed to have proved, that the location of
the *Dragon* lots, and of the last-mentioned lot particularly,
was made immediately after the order of the General Court
in 1640 ; and that such location was followed by immediate
and uninterrupted possession.    The plaintiffs claimed, that be-
fore the location of any of the *Dragon* lots, a highway was
laid out on the *Easterly* bank of *Dragon* river above high-

water mark ; and that in the original location of these lots, they *NewHaven,*
were bounded *Westerly* on such highway, leaving the fee of <u>July, 1828.</u>
the highway in the original proprietors of *New Haven;* which East-Haven
had since passed to the town of *East-Haven.* The defendants Hemingway.
insisted, that the *Dragon* lots, as originally located, were bound-
ed *Westerly* by the river ; and if there was any highway along
the bank of the river, it was laid over their land.   In support
of the claims of the parties respectively, regarding this highway,
much evidence was introduced on each side, which it is not
now necessary to state.

The judge instructed the jury, that by the charter of *Charles*
II., granted to the colony of *Connecticut,* in 1662, the land
between high and low water mark belongs to the adjoining
proprietors of the substantial soil.   Whoever owns the substan-
tial soil to high water mark, owns the amphibious property be-
tween high and low water, as an appurtenance, for wharfing
and other purposes of navigation, not obstructing the public
accommodation ; and no man, who thus owns the land to high
water, can be deprived of the reasonable use of this appen-
dage, unless by his own folly or consent.   The king, in his
charter, granted *ports* and *havens.*

That the legal import and effect of the  patent given by the
colony of *Connecticut* to the proprietors and inhabitants of the
town of *New-Haven,* in 1685, is a charter of *confirmation* and
of *grant ;* a confirmation of all they had acquired from the na-
tives, by purchase or otherwise, honestly ;—confirmation of all
previous disposition of lands made to  individuals,  by the Ge-
neral Court of the colony of *New-Haven,* or by those acting
under their authority ;  and a grant to the  proprietors and in-
habitants of *New-Haven,* as tenants in common, of the residue
of all the lands that had not been previously disposed of, with
all the privileges appertaining to property of this character,
which were granted to the colony of *Connecticut,* by the
charter of *Charles* II.

That consequently, the land  in question was vested in the
then proprietors and inhabitants of the town of *New-Haven,*
unless it had been previously disposed of, by the colony of
*New-Haven.*

That by the incorporation of the village of *East-Haven* in
1707 ; by the assumption of the powers of a distinct body cor-
porate by the  proprietors of the common and undivided lands
lying in that village, in disposing of the common and undivided

*NewHaven,* lands lying within its limits, with at least the tacit acquiescence
July, 1828 of the proprietors of the other section of. *New-Haven ;* and
East-Haven especially, by the confirming act of the General Assembly in
*v.* 1756,—the proprietors in *East-Haven* were a body corporate,
Hemingway. and, as such, owned, and had a right to dispose of, all the common and undivided lands within the limits of that village.

That by the votes of the proprietors of *East-Haven* in 1797, in connexion with the confirming act of the General Assembly in 1825, the town of *East-Haven,* the plaintiffs in this action, acquired a valid title to the land in question, unless it had been previously disposed of.

The judge then proceeded to examine the claim of title set up by the defendants. After stating the grant of the colony of *New-Haven* in 1640, he remarked : " Under this grant the defendants claim ; and the question is, whether these rights were taken up, how located and when ? These individuals had the right, within a reasonable and proper time, to make their location of their respective lots on the *Eastern* bank of *Dragon* river ; to fix stakes at high water mark, and extend back *Easterly* until they encompassed their complement ; and all in front of this amphibious ground between high and low water mark, was his or theirs, and nobody could cut off their water-front without their consent. The turning point in the case must be, whether anterior to the year 1685, the lot immediately to the *Eastward* of the land in question, under any of the rights granted to the thirty-two individuals, was taken up and located on the *Eastern* bank of *Dragon* river ; and whether the defendants deduce their title from such locations under any one of these original grantees."

In relation to the highway claimed to have been laid out on the *East* side of *Dragon* river, the judge said: " If there was a highway laid out and established on the *East* side of *Dragon* river, and *Easterly* of high water mark, before the lot, of which the land in question is claimed to be an appurtenance, was located, and that lot was located and bounded *West* on the highway, it follows of course, that the defendants' claim of title fails. But whether there was, or was not, a highway as claimed, if the proprietor of the lot under the grant of 1640, did locate his land on the river, on the *East* bank, the highway is no impediment ; as he or his assigns always have had, and still have, the fee of the highway."

The judge concluded his remarks upon this branch of the

case, by submitting the question of fact thus: " If you find, *NewHaven,* gentlemen, that any one or more of the thirty-two grantees, July, 1828. under the act of the General Court of the colony of *New-Ha-* East-Haven *ven* of 1640, located his or their lot or lots of planting ground Hemingway. on the *East* bank of *Dragon* river, and took the shore or high water mark as the boundary ; and that the defendants have deduced their title from that source ; you will find, that the defendants have done no wrong," &c.

The jury returned a verdict for the defendants ; and the plaintiffs moved for a new trial.

The case was argued before this Court, *July* term, 1827, by *Sherman* and *R. S. Baldwin,* in support of the motion, and by *N. Smith* and *Seeley,* contra ; and was continued *to advise.*

The counsel for the plaintiffs contended, 1. That they had shewn a good title to the demanded premises. In support of this general position, they insisted,

First, that by the common law of *England,* the title to the soil under all navigable waters, where the tide ebbs and flows, is vested in the king. He holds the *jus privatum,* subject to the public rights of fishery and navigation. *Hale de Jure Maris, part* 1. c. 4. [*Harg. Law Tracts* 12. & seq.] *Com. Dig. tit.* Navigation. A. B. The case of the *Royal Fishery of the Banne, Davies* 155. (*Dub.* ed. 1762.) *Carter* & al. v. *Murcot* & al. 4 *Burr.* 2162. *The Attorney General* v. *Richards,* 2 *Anstr.* 603. *The King* v. *Smith* & al. *Doug.* 441.

Secondly, that the king may grant this soil to a subject or corporation, subject only to the public rights. *Harg. L. T.* 17. 18. 22. 32. 36. *The Royal Fishery of the Banne, Davies* 149. *Carter* & al. v. *Murcot* & al., 4 *Burr.* 2162. *The Commonwealth* v. *The Inhabitants of Charlestown,* 1 *Pick.* 180. *Angell on Tide Waters,* 33, 4.

Thirdly, that by the charter of 1662, *Charles* II. granted all his interest in the soil under the navigable waters, as well as in the upland, with the powers of government to the colony of *Connecticut,* with reservation of the common right of fishery, " in derogation of which no modern grants can be made." Per *Bailey* J., in *Blundell* v. *Catterall,* 5 *Barn. & Ald.* 268. (7 *Serg. & Lowb.* 108.) See *Cowp.* 213. as to grants of political power. 1 *Pick.* 180.

Fourthly, that the colony of *Connecticut,* by their patent of

*NewHaven,* grant and confirmation, conveyed the *jus privatum* of the soil
July, 1828. under navigable waters, to the inhabitants of *New-Haven,*—
East-Haven subject, of course, to the public rights of fishery and naviga-
*v.*
Hemingway. tion.    The subjects of the grant are " all lands, soils, heredit-
aments, rivers, fishings," &c.    The words might have passed
even the fishery, but for the reservation of that common
right in the king's charter.

Fifthly, that the proprietary interest in the *locus in quo* hav-
ing passed from the proprietors of *New-Haven* to the propri-
etors of *East-Haven,* and from them to the town of *East-Ha-
ven,* it follows that the plaintiffs own it, unless the defendants
can shew a paramount title.

2. That the charge in relation to the title of the defendants
was wrong.    The defendants claimed title under a location
pursuant to an order of the General Court of *New-Haven* in
1640, authorizing certain persons to locate *planting ground
East* of *Dragon* river, and subsequent conveyances to them-
selves bounding *on* the river.    The plaintiffs claimed, that an-
terior to this grant and location there was a *highway* by the
side of the river.    The judge charged the jury, that under this
grant, though the jury should find, that there was a highway
previously laid out ; yet the grantees might lawfully locate over
the highway to the river ; and that whoever owned the adjoin-
ing upland had, as an appurtenance, the right of wharfing out.
Both these positions the counsel for the defendants denied.

First, the grant was of *planting ground.*    Its construction
must be most favourable to the public.    It cannot enure to any
other intent than that which is *precisely expressed.*    4 *Cruise's
Dig.* 567.    Even what is necessary to the enjoyment of the
thing granted, shall not pass, without express words.    *Ibid.*
The location over a highway would be unnecessary to the en-
joyment of the grant ; foreign to its object ; and inconsistent
with the rights of the public, since wherever they might law-
fully locate, they might *plant.*    Independently of the grant,
the defendants have acquired no right to come *to* the river.

Secondly, if the grantees could make a lawful location *to the
river,* they could acquire no rights there below high water
mark.    There is no pretence, that any title to the *locus in quo*
has been acquired by possession    It was unoccupied until the
defendants entered, and erected their wharf.    The legal pos-
session of unoccupied land is always according to the right.
The grant of 1640 was made two years after the settlement of

NewHaven,
July, 1828.

East-Haven
*v.*
Hemingway.

the colony.   Our ancestors brought with them the common law as their birth-right ; and its rules in regard to tide waters, were then well settled and understood.   They have since been repeatedly adopted and sanctioned by our courts.   *Adams* v. *Pease*, 2 *Conn. Rep.* 481.   *The Commonwealth* v. *Charlestown*, 1 *Pick.* 180.   *Cortelyou* v. *Van Brundt*, 2 *Johns. Rep.* 357.   *Storer* v. *Freeman*, 6 *Mass. Rep.* 435.   *Peck* v. *Lockwood*, 5 *Day* 22. 26.   *Hooker* v. *Cummings*, 20 *Johns. Rep* 90. 100.   By the rule of the common law, as adopted in these cases, the adjoining proprietor holds only to high water mark. In *Massachusetts* the common law was altered, by an ordinance in 1641, the year after the defendants' grant.   In *Connecticut*, it has never been altered ; and it cannot be, in reference to our waters, without violating important vested rights. If then, these flats were not granted in 1640, they *remain* to the proprietors, and those who claim under them.   The plaintiffs have, therefore, a right to recover, unless it can be successfully maintained, that the defendants came to the river, the highway notwithstanding ; and that adjoining proprietors have necessarily a legal right to wharf out in front of their land. Even in *Massachusetts*, notwithstanding the ordinance of 1641, the courts hold, that the owner of flats and upland *may* grant the one without the other ; and that a deed bounding "*on* the shore," does not convey the flats.   *Storer* v. *Freeman*, 6 *Mass. Rep.* 435. S. C. *Angell on Tide-Waters*, appx. 149.   But the grant of 1640, being confined to *planting ground* beyond the river, and made in reference to the common law rule, is as much *exclusive* of the flats, as if it had been bounded by "the shore," or " to high water mark," or by feet and inches.   See *Harg. L. T.* 12. & seq.   *Pratt* v. *The State*, 5 *Conn. Rep.* 398.

But it may be said, that without acquiring any *title* to the flats, an individual may, as *appurtenant* to his land, wharf out, if he does not erect a nuisance.   This doctrine can never be true, where the flats are owned by one man, and the uplands by another.   In *England*, when the soil of the shore is in the king, such erections by the adjoining proprietor, are *purprestres* —*i. e.* encroachments on his *jus privatum*.   If nuisances, they must be abated ; if not, the king may rent them.   *Harg. L. T.* 13.   2 *Anstr.* 603.   In such case, the owner of the adjoining upland does not, by wharfing, violate the private rights of any individual ; and if his erection is not a nuisance, the public

*NewHaven*, would ordinarily permit it to remain.    The right of wharfing, in such case, however, has been directly denied, in *Pennsylvania ; (Respublica* v. *Caldwell,* 1 *Dall.* 150.) and is disallowed, by statute, in *Rhode-Island.*    But allowing it, in its full extent, it does not interfere with the plaintiffs' claim.

<div style="margin-left:2em">July, 1828.<br>East-Haven<br><i>v.</i><br>Hemingway.</div>

 The counsel for the defendants, contended, 1. That the charter of *Charles* II., in 1662, did not convey the soil under the tide waters to the grantees ; and much less did the patent of 1685, from *Connecticut* to *New-Haven.*

 First, the grant of " ports, havens, rivers," &c., conveys only the use of the water,—not the soil under it    *Co. Litt.* 4. *Harg. L. T.* 33.    *Cro. Car.* 492.    *Yelv.* 143. and n. (1). by *Metcalf. Shep. Touch.* 97.    3 *Bla. Comm.* 18.    1 *Swift's Dig.* 74.    *Davies* 149.

 Seeondly, the king owns the shore of the sea, by virtue of his *royal prerogative ;* and a prerogative right can be passed only by apt, precise, and necessary words.    The first part of this proposition is supported by *Hale* throughout ; by *The Attorney General* v. *Farmen,* 2 *Lev.* 171.    *Davies* 149. As to the second part of the proposition, see 1 *Plowd.* 310. 336. *Hob.* 243.    17 *Vin. Abr.* 133. and the cases there cited.    *Davies* 149.    *Harg. L. T.* 17. 18. 33.    Now, the patent of 1685 contains neither general words, nor words of particular description sufficiently comprehensive to include the demanded premises.    They are not conveyed by the *sweeping clause ;* the use and object of which, is, to guard against any accidental omission, but still to refer only to estates or things of the same nature and description with those that have been previously mentioned.    *Per* Lord *Mansfield* in *Moore* v. *Magrath, Cowp.* 12.

 Thirdly, the patent of 1685, is, in its object, and on the face of it, only a charter of *confirmation.*    It does not purport to convey to the inhabitants of *New-Haven* any lands which they had not before acquired from the *Indians :* it only confirms and ratifies their ancient title to those " lands, both meadow and upland, so purchased and granted to them as aforesaid," (*i. e.* by the *Indians*) whereof they have stood seised, and in quiet possession, for many years past, without interruption."    *Co. Litt.* 295.    *Shep. Touch.* 311. 314. & n.

 2. That the title of the proprietors of common and undivided lands in *East-Haven* never passed from them, and has

never been conveyed to the plaintiffs. Such proprietors may *NewHaven,* divide up the lands among themselves; but a majority of July, 1828. them, by a mere vote, without consideration, cannot pass the East-Haven title to strangers. The town of *East-Haven*, therefore, has no *v.* Hemingway. pretence of title.

3. That if the demanded premises could, in any sense, have been considered as comprised in the terms of the patent of 1685, from the facts of the case it is apparent, that the grant *quoad Dragon* river, was never accepted, by the grantees; and that neither they, nor any person under them, ever claimed title until the bringing of the present action.

4. That if the demanded premises ever belonged to the grantors of the plaintiffs, their title has, long since, been *abandoned* to the public. They have not kept up the evidence of their right; nor taken any measures to guard it; no claim having been ever made or act of ownership *exercised*, on their part, until the commencement of the present action. *Hale, passim. The Attorney General* v. *Richards,* 2 *Anstr.* 603. *Miles* v. *Rose,* 5 *Taun.* 705. *Chad.* v. *Tilsed,* 2 *Brod. & Bing.* 403. (6 *Serg. & Lowb.* 171.)

5. That the charge of the judge to the jury was correct. The substance of the charge is, that the proprietor of land adjoining tide waters has a right to wharf out below high water mark, for the purposes of navigation and commerce. All grants, which may be made of the public interest in tide waters, are necessarily *affected*, as Lord *Hale* expresses it, with this right in adjoining proprietors, for the purposes of navigation. *Harg. L. T.* 22. 85. Such is the common law of *Connecticut*, as evidenced by immemorial usage, founded on the nature of the property and the exigencies of navigation. 1 *Swift's Dig.* 109. In *England*, the law vests the ownership of the soil under tide waters in the king as *trustee* for the benefit of his subjects; a right, which cannot be exercised to their exclusion, either by the king or his grantee, since *magna charta. Hale, passim. Blundell* v. *Caterall,* 5 *Barn. & Ald.* 268. (6 *Serg. & Lowb.* 91. 93. & seq.) *Com. Dig. tit.* Navigation. A. In this country, it is emphatically true, that we acknowledge no right in the sovereignty but what is necessary for public purposes.

HOSMER, Ch. J. The controversy between the parties in this case, regards only the title of the land demanded.

*NewHaven,*
July, 1828.

East-Haven
*v.*
Hemingway.

The plaintiffs claim title under the charter of *Charles* II. in 1662, to the colony of *Connecticut;* by a patent from the colony, in 1685, to the town of *New-Haven;* and by a grant from the proprietors of this town.

There is no doubt concerning the competency of *Charles* II. to convey the land in question to the colony of *Connecticut.* A river, where the tide ebbs and flows, is an arm of the sea ; and the shore is that space of ground, which is between ordinary high water and low water mark. *Hale De Jure Maris, pars* 1. *c.* 4.   *Harg. L. T.* 12.   The title of the king, *prima facie,* to all ports and arms of the sea to high water mark, and to the soil thereof, has long been established law ; and, as an undoubted consequence, it is settled, that he may grant the property of the soil between high and low water mark to a subject or corporation.   *Harg. L. T.* 12. 17. 32.   5 *Rep.* 107.   *Dyer* 93.   *Com. Dig. tit.* Navigation A. B.   *Davies* 56, 7. 149. 2 *Anstr* 605.

Whether on the legal construction of the charter of *Charles* II., the shores of navigable waters were granted to the colony of *Connecticut,* is a question admitting of controversy, on which it is unnecessary to enter.   Clear I am, that they were not intended to be conveyed to the proprietors of *New-Haven,* by the act of 1685.   By this instrument, the General Assembly of *Connecticut,* gave, granted, ratified and confirmed to the proprietors of *New-Haven,* " all that parcel, or tract or tracts of land and premises," butted and bounded in such manner as to comprise the river in question, " together with all the meadows, pastures, swamps, upland and arable land, woods, islands, ponds, ways, *waters, water-courses,* havens, ports, *rivers, fisheries,* huntings, fowlings, mines, minerals, quarries, and precious stones," within the aforesaid bounds and limits   The suggestion that the act of the General Assembly was only *confirmatory* of a former grant in the town of *New-Haven,* I lay out of the question.   By the operative words *give, grant* and *ratify,* it was not only a confirmation, but a *grant.*   1 *Inst. sect.* 515. 531.   *Shep. Touch.* 83   4 *Cruise's Dig.* 301. *sect.* 40.   *Jackson* d. *Klock* & al. v. *Hudson,* 3 *Johns. Rep.* 375.   *Jackson* d. *Troup* & al. v. *Blodget,* 16 *Johns. Rep.* 172. 178.   At the same time, it must be admitted, that the principal, if not the sole object of the grant, was, to confirm to the proprietors the title to their lands purchased of the natives, which *they* had not legal capacity to sell; (3 *Johns. Rep.* 375.   6 *Cranch.* 87.   8

*Wheat Rep.* 543.   3 *Kent's Comm.* 308. ;) and of which the proprietors had been in the quiet possession for many years. *Vid.* grant of 1685.

In expounding the legislative confirmation and grant, I adopt as the principle of construction the meaning and intention of the General Assembly, derived from a fair interpretation of their expressions.    If it were necessary, perhaps, the rule respecting the exposition of royal grants, which are ever construed most favourably for the king, might with propriety be applied in construction of the act of 1685 ; it being matter of record, and proceeding from the bounty of the legislature. *Plowd.* 243.    5 *Cruise's Dig.* 49.    But this case does not require any strained principle of interpretation.

In the first place, it has been argued, that the shores of *Dragon* river were granted to the proprietors, the inhabitants of *New-Haven,* as they were included within the general boundaries of the grant.    The contrary of this was decided in *Palmer* v. *Hicks,* 6 *Johns. Rep.* 133. on the principle, that a grant to a town extending on both sides of a navigable river, so far as the river extends, is for the purpose of jurisdiction only, and not with intention to convey the soil underneath the water, or below high water mark.    It is not presumable, that it was the object of the grant to convey the public right of the colony in the shores of navigable rivers to the purchasers of lands from the natives, requesting the confirmation of their title.    A right so important as this is to the public, cannot be considered as parted with, except by words so unequivocal, as to leave no reasonable doubt concerning the meaning.    The construction advanced by the plaintiffs, is a novelty, and inconsistent with the conduct of the proprietors adjoining *Dragon* river, for more than a century.    The action before the court is the first claim made by the plaintiffs to the shore of this river.

The plaintiffs have insisted, that theirs is the soil of the shore of *Dragon* river, by the express words of the grant to the proprietors of *New-Haven.*    After including the river within the general boundaries, a sweeping clause is added, whereby the meadows, pastures, &c. are granted, with the *waters, water-courses, havens, ports, rivers, fishings,* &c. within the bounds before alluded to, and all and singular the other commodities, privileges, franchises and hereditaments whatsoever thereunto belonging, or in any ways appertaining.    This

clause was intended to guard against any accidental omission. *Cowp.* 12. Much the greater part of it has not even a remote reference to the subject of controversy ; nor can I discern a word, or expression, that has any essential bearing upon it. The terms " *waters,*" " *water-courses,*" " *ports,*" " *havens,*" " *rivers,*" and " *fishings,*" approach the nearest ; but it is unquestionably clear, that the words *ports* and *havens* are irrelative to the matter in question ; and that by either of the other expressions, the *soil* is never conveyed. *Co. Litt.* 4. *b. Yelv.* 143. 2 *Bla. Com.* 18. *Shep. Touch.* 97. *Com. Dig. tit.* Grant. E. 5. 1 *Swift's Dig.* 74. They are adapted, at most, to the conveyance of a franchise.

By the expressions " commodities, jurisdictions, royalties, privileges, franchises, preeminences, and hereditaments," there is no extension of the grant to the soil in question. The word " hereditaments" is the only one, on this point, meriting attention ; and it is perfectly incredible, that by a term so general, the General Assembly intended to convey the soil of a navigable river, which was unquestionably within the boundaries of the grant, and which, notwithstanding this, was not thereby conveyed. A word or expression precisely to denote a grant so much out of the common course, would have been employed ; and not a general term, which, on the construction contended for, would regrant all that had been granted, and give an exclusive right to the soil under all rivers, ports and havens within the exterior lines of the supposed conveyance.

I am sensible, that too much, already, has been said respecting the word " hereditaments." Taking the entire clause in which this term is found, it is unquestionable, that it was not inserted to convey the soil, but was used synonymously with some of the other general expressions recited. The act, in the first place, grants land within certain boundaries. It next, by a number of terms, supplies any accidental omission of the subjects intended to be granted. It then closes, by conveying " the commodities, privileges, franchises and hereditaments, belonging to or any ways appertaining to any part or parcel" of the land, lying within the specified boundaries. The term " hereditaments," therefore, as well as the words " commodities, privileges and franchises," was never intended to convey the soil, but something appurtenant thereto ; for the thing conveyed by this term, is that " which was *belonging to or in any way appertaining*" to the land granted.

To consider the other documents and testimony exhibited, *NewHaven,* in establishment of the plaintiffs' title, is unnecessary  The whole rests on the grant of 1685, and that failing, it is of course, that the plaintiffs' title must fail also.  The judgment below, therefore, is correct.

Whether the defendants have title is an enquiry of no importance, so far as this case is concerned.  But as on this point the court have come to a result, I will briefly express their opinion.

The General Assembly of the colony of *New-Haven,* in 1640, granted thirty-two lots of land to certain individuals, for the purpose of planting, to be allotted on the *East* side of *Dragon* river.  The grant was located near the *East* bank of that river, in part over a highway, and bounded on high water mark, directly in contact with the shore now demanded.  The defendants have traced their title to the land in question to one or more individuals to whom the grant was originally made. This brief statement of the facts is sufficient to estimate the force of the objections made to the defendants' title.

In the first place, it was said, that the lots having been granted for the purpose of *planting,* the grant cannot enure to any other intent ; and that they could not legally be laid out, in part on a highway, as they would, to this extent, be incapable of cultivation.  If this view of the subject were sound, it would become a material question, whether any person except the grantors, could take advantage of the breach of contract ; but it is without any foundation.

The fallacy of the argument consists in supposing, that to the grant of the lots there was subjoined the condition or qualification that they should be *planted,* according to the modern acceptation of this term.  If the actual planting of the land granted, was the condition on which the land was to be held, the omission of this act would be a breach of the contract, and the grantors might enter.  A little reflection will shew, that the grant was not thus qualified.

In order to the construction of the grant or contract, it is necessary to go back to the age when it was made, with a view to ascertain what, at that time, was meant by the words *planting* and *plantation,* when applied to such a subject matter. We are now to investigate the meaning of expressions, used a century and a half since, which then had a peculiar intent, that has become obsolete.  By the word to *plant,* was then intend-

ed, when applied to a tract of land, to *settle*, or to *establish*; and a *plantation*, the derivative of planting, denoted sometimes a colony, and sometimes a farm or cultivated estate. Thus, in the charter of 1662, the colony of *Connecticut* was called "a plantation," and its *Northern* boundary was the line of the "*Massachusetts* plantation;" and in the act of 1685, the township of *New-Haven* was empowered to manage its " plantation affairs,"—meaning, undoubtedly, that it might act in all the concerns of the town.

When the General Court of the colony of *New-Haven* granted to thirty-two individuals a tract of land for the purpose of *planting*, no more was intended, than that it was conveyed to them that they might establish themselves thereon, and cultivate their settlement or small plantation, as they should think proper. Of consequence, they had as good right to locate the grant in part on a highway, from which they might derive accommodation, as they would have, at any subsequent period, to grant a right of passage over their lands.

The defendants are bounded on *Dragon* river at high-water mark ; and they claim, that they have legal right to occupy the shore in front of their land, and for commercial purposes to erect buildings upon it. Whether this position is correct, is the only remaining question in the case. I shall not recur to the various topics expatiated on, in the able and elaborate argument of the learned counsel on both sides, upon the matter in question. I place myself on ground more narrow, but perfectly satisfactory to my mind.

It was laid down as the law of this state, by Judge *Swift*, more than thirty years since, in the first volume of his *System*, (340. 341. 343 ) that all adjoining proprietors on navigable rivers have a right to the soil covered with water, as far as they can occupy it, *i. e.* to the channel, with the exclusive privilege of wharfing and erecting piers in front of their land, but with this qualification, that they do not impede the navigation of the water. By this expression I do not understand, that the proprietors alluded to were *seised*, but that they had a right of occupation, properly termed a franchise. 1 *Swift's Dig.* 109.

In the case of *Peck* v. *Lockwood*, 5 *Day* 22, the plaintiff claimed title to the shore of navigable water, being flats between high and low water mark, by deeds, one bounding him *South by the water*, and the other *Southerly by the cove.* The action was trespass for the taking of shell-fish between high and

low water mark ; to which the defendant justified, on the *New Haven,* ground that the fishery was of common right ; and the justifi- cation was sustained.   In delivering the opinion of the court, *Reeve*, J. said : " The defendant denies, indeed, thet the place in question was covered, by the plaintiff's deeds, as set forth in the case stated.   I shall lay this question out of the case, by only observing, that I entertain no doubt but that the flats were included in the plaintiff's deed so as to convey to him the right of soil."   I cite this as the opinion of a respectable judge, and not of the court ; and although the expression is somewhat equivocal, I consider it as equivalent only to the established law, as declared by Judge *Swift*

That the law, as I have stated it, is not now to be question- ed, the usage of the owners of land to high water mark, on navigable streams, in front of their land, to erect wharves, " time whereof the memory of man runneth not to the contra- ry," is conclusive evidencce.   It stands on the same ground of general usage, which is at the foundation of the common law.

The right of individuals to use the soil of the shore, subject to the paramount rights of the public, so far as my information extends, has never, until now, been disputed.   The exercise of it, in all our towns, bounded on navigable waters, and the en- joyment of estates under it, is known to every one.   On the death of a land-owner to high water mark, his estate in the shore and the erections upon it, has descended to his heirs ; and thus estates have been uniformly settled.   *Angell* on *Tide Waters, chap.* VIII. *p.* 125 & seq.

On the part of the public, no objection has been made.   The interest of navigation has been subserved, and the consequen- ces have been altogether salutary.

It necessarily results, that the defendants have title to the land demanded ; and for this reason, as well for deficiency of title on the plaintiffs' part, the judgment below was correct.

PETERS and LANMAN, Js. were of the same opinion.

BRAINARD, J. having been absent when the cause was argu- ed, and DAGGETT, J., having been of counsel in the cause, gave no opinion.

New trial not to be granted.