ISAAC CHURCH *vs.* SILAS MEEKER.

In order to recover in an action of trespass *quare clausum*, the plaintiff must show an actual possession ; or a title, in connection with the fact that the actual possession is not in another or others.

The sea-shore is that space of land on the borders of the sea between high and low water mark.

In 1651 the title to the sea-shores of Connecticut was in the King, as one of the "royalties" of the crown, in trust for the use of the public.

That title passed by the charter of Charles II to the Governor and Company of the Colony.

The rule that a grant of a tract of land bounded on a highway, carries the title *prima facie* to the center of the highway, is founded on the presumption "that the way was taken out of the party that hath other lands adjoining," and the rule and presumption are applied, though it appear that the way was reserved by the original settlers and proprietors, before the adjoining lands were allotted and granted to individuals.

Sedge-flats lying below high water mark in an arm of the sea are part of the "sea-shore," are not "meadows," and did not pass by grants made by the General Court to the proprietors of towns in 1685–6 after the charter of Charles II was granted to the Colony.

Title to such a flat may be gained against the state by adverse possession.

One who acquires a title to a lot of land bounded on a highway by disseizin, ordinarily acquires such title to the center of the highway ; but the rule is otherwise where the entire soil of the highway belongs to a different owner, unless the disseizor had an actual exclusive occupation of the highway also.

Where a highway was reserved by the original proprietors on a beach, the outer line being located at high water mark, it was held that the beach was a "public beach" within the meaning of the statute relating to the title to sea-weed, which uses those terms.

In such case if the riparian proprietor is bounded by the water or shore he takes title to the entire highway. Whether he takes such title if bounded by the highway : *quære*.

Sea-weed cast by the tide and waves upon the land of a riparian proprietor becomes the property of the owner of the land. ·

One who heaps up sea-weed which is cast upon a " public beach " acquires a title thereto by the statute if he removes the weed within the twenty-four hours next succeeding. If he fail to *remove* it his title is lost.

TRESPASS, for entering upon land on the shore of Long Island Sound, and taking and carrying away sea weed therefrom ; reserved by the superior court on a finding of the facts for the advice of this court. The facts are fully stated in the opinion.

*Ferry* and *L. Warner, Jr.*, for the plaintiff.

*Carter* and *Wilson*, for the defendant.

BUTLER, J. This case is of trifling pecuniary consequence, but it has peculiar features, and presents a question of public right to an extended line of beach, the determination of which involves other questions of considerable interest, and we have given it a deliberate consideration.

The declaration charges an unlawful entry upon the land of the plaintiff, and also the taking and carrying away therefrom of a quantity of sea weed, which is an article capable of ownership as personal property, and which was claimed by him. The plaintiff was bound to show the truth of one of the charges, and, (no special demurrer having been interposed,) was entitled to recover upon proving either the unlawful entry or the unlawful asportation of his property. *Holly* v. *Brown*, 14 Conn., 255.

1. We are first to determine then, whether the defendant committed a trespass, as alleged, by entering unlawfully upon the *land* of the plaintiff. In order to maintain this branch of the case the plaintiff was bound to show that he was in the actual exclusive possession of the place where the trespass is claimed to have been committed ; or a title to it, in connec-

Church *v.* Meeker.

tion with the fact that it was not in the actual exclusive possession of another or others.

It appears that the defendant entered upon a line of beach, between ordinary and extraordinary high water mark, and took therefrom a load of sea-weed, which grew in the adjoining harbor (an arm of the sea) below low water mark, and had been thrown upon the beach by the tide and waves, and a part of it gathered into heaps by an employee of the plaintiff. The beach was not in any enclosure of the plaintiff, nor connected strictly with any upland upon which the tide never flowed, but was upon the side of an extended field of salt meadows, which were covered by extraordinary tides; and it had been formed by the abrasion of the shore, and the washing and piling up of the coarse sand and gravel by the waves of that arm of the sea. The public had immemorially used the beach, by passing and driving over it and taking sea-weed from it. The plaintiff owned the adjoining shore between high and low water mark, and he or his grantors had immemorially used it. It was a sedge-flat, and they mowed it and took the annual crop of sedge. But neither the grantors of the plaintiff nor the plaintiff used the beach otherwise than as the public used it, by traveling upon it and taking sea-weed from it; and the defendant had been in the habit of taking the weed for twenty-five years. The plaintiff's father had in a few instances forbidden individuals to take the weed; and the plaintiff, four years before, set up a notice prohibiting all persons from taking it, and the defendant, and public generally who had occasion to go there, saw the notice, but did not regard it. It is clear from these facts that the plaintiff did not show such an exclusive possession of the beach as would, alone, enable him to maintain the action.

Did he show a title? He claimed to show one by a deed from Stephen Betts to his father, given in 1828, and by inheritance from his father, and partition with his brother. The deed from Stephen Betts to his father purported to convey a sedge-flat, and bounded the grantee west on the highway. It is found that there was and is a highway on the beach, but the precise eastern line of it is not found. The court found

that it was probably at high water mark. The present traveled path is a rod or more from that mark; but it is further found that the travel has been driven westward by the abrasion of the shore, and the piling up of the coarse material loosened by it.

Referring to the deed of 1828 we find the subject matter of it described as follows:—"A certain piece of sedge-flat in said Norwalk, at the great marsh, so called, bounded north by the heirs of Isaac Betts deceased, east and north-easterly by Saugatuc harbor, south by the heirs of Thomas Betts deceased, and southerly and westerly by the highway—the described premises being a narrow strip of land lying near the spreading place, so called, on said marsh, extending along the sea shore about two hundred rods to the land of Daniel Betts at the bluff, or near thereto."

It is apparent that no land above high water mark was conveyed, in express terms, by that deed. Salt "sedge" grows only on land covered by the tide at ordinary high water, and the term "flat," when used as descriptive of anything respecting an arm of the sea, means a level place over which the water stands or flows. The term "sedge-flat" therefore imports a tract of land below high water mark. Such also is the meaning of the other descriptive term used, "shore." Applied to the sea, or an arm of it, it has a technical, legal meaning. Bouvier, in his Law Dictionary, defines the "sea shore" as "that space of land on the borders of the sea which is alternately covered and left dry by the rising and falling of the tide—or in other words, that space between high and low water mark." This definition was taken from Hale, (*De Jure Maris*,) and has been in several cases approved by this court. Judge Hosmer in *East Haven* v. *Hemingway*, 7 Conn., 186, citing Hale, says, "the *shore* is that space of ground which is between ordinary high water and low water mark." The legal meaning of the term is indisputable.

Now in the deed in question the premises conveyed are first described as "a certain piece of *sedge-flat*, in said Norwalk, at the great marsh so called." The boundaries are

Church *v.* Meeker.

then given ; and then, for quantity, it is described as " extending along the shore about two hundred rods." "Along" means " by," " on," or " over," according to the subject matter and context. Here it can only mean " on." But if the language left room for doubt, the meaning of the description would be conclusively settled by the surrounding circumstances—the nature of the premises, and the immediate and continued occupation. When the deed was given the sedge-flat, and the whole of it, was in fact below high water mark ; and the father of the plaintiff took immediate possession of that, and that only—taking the annual crop of sedge, and did not thus occupy the beach above.

As then the deed describes, and the grantee took possession of and occupied, the narrow strip of sedge-flat below high water mark, it is further apparent that the granted premises were part of the " sea shore," and that the grantee could take nothing more by force of its express terms, and therefore acquired no title to any land above high water mark ; unless by virtue of the presumptions which carry the title of premises conveyed as bounded by a highway, to the center of the way, in cases where upland is conveyed.

The plaintiff did indeed claim, not only that he was bounded by the center of the highway, but that the east line of the highway was above high water mark, and therefore that his deed covered the place where the weed was taken ; but his claim is not consistent with the finding, the condition of things then existing, or the character of the deed.

In the first place, as the deed did not purport to convey any upland, it was incumbent on him to prove that the east line of the highway was above high water mark. Proving that there was a traveled path a rod above it did not prove the location of the line. Highways are usually wider than the path in which the public travel. And the finding is that the highway was probably reserved to high water mark ; and that probability is very strong if we look only at the original condition of things. There was no upland on which to make it, the tract on the west was an extensive field of salt meadows, and only on the beach at that point was there a gravelly

or sandy spot on which the public could travel. It was natural therefore that the highway leading to the meadows around and below should be reserved on that beach, and that the east line should be located at high water mark. Such was, in those days, the practice in such cases, and so most and perhaps all the public beaches were constituted.

But on this subject we need not and cannot speculate. The deed on its face contains controlling evidence that the line of the highway was at high water mark. It describes a sedge-flat, which could not exist above that mark, and describes it as bounded on the highway. The two are described as coming together; and as the sedge-flat could not and did not extend above high water mark, the highway must have been laid to it. There was no possibility of their meeting at any other point; and the court might well have found that they did meet there, in positive terms, if it had deemed it necessary.

The line of the highway being undoubtedly coincident with that of the shore, we are brought again to the question, whether the deed to the plaintiff's father gave him a title to the center of the highway. The defendant claims, and it is found, that the high water mark has been carried to the west by the abrasion of the shore ; but it is not found that it was carried to the original center of the highway ; and that claim cannot be successfully interposed. Are then the same rules or presumptions to be applied in this case as are applied to conveyances of upland bounded on a highway ? Here the peculiarities of the case, arising from the fact that the deed purports to convey nothing but sea shore, meet us and necessarily come under review; and we find difficulties in the way of the plaintiff's claim of title in the highway and beach which are insuperable.

The rule that a grant of a tract of land bounded on a highway, carries the title *prima facie* to the center of the highway, is founded on the presumption "that the way was taken out of the party that hath other lands adjoining." And the presumption and rule are applied, though it appear that the way was reserved by the original settlers and proprietors

before the adjoining lands were allotted and granted to individuals. *Stiles* v. *Curtis*, 4 Day, 336. The original proprietors undoubtedly had title to the beach; and if it appeared that they ever had title to the sedge-flat, or had ever assumed to own it, and had granted it, bounding the grantee on the highway, the presumption and rule would apply, and the plaintiff's title be proved. For if they had no title in fact to the sedge-flat, but had assumed to grant it, and bounded the grantee on the highway, the intention to grant to the center of the highway would be presumed, and the deed, though inoperative as to the shore, would be operative as to the beach which they owned, and convey it, upon the familiar principle that a deed shall operate as far as it legally can. But it does not appear that the proprietors of Norwalk ever had a title to this sedge-flat or shore, or that they ever assumed to convey it, and neither can be legally presumed for several reasons.

When in 1651 the first settlers and proprietors of the town of Norwalk purchased it of the Indians, with the assent and sanction of the General Court, the title to all the shores of the sea and its arms, and of course of that in question, was in the King by force of the common law, in trust for the public use. Afterwards, by the charter procured from Charles II in 1662, all the lands of the colony were granted to the corporate freemen. The question whether or not the charter conveyed the royal title to the shores of the sea has never been decided in this state. It was raised in *East Haven* v. *Hemingway*, 7 Conn., 186, and Judge Hosmer, who gave the opinion of the court, doubted it; but the question was not a material one and was not decided. He did not think the charter contained apt words to convey it. Since that, however, the question has arisen in respect to a similar grant to the Plymouth Colony in Massachusetts by James I., and the Supreme Court of that state, Judge Shaw giving the opinion, held that it did. They found a sufficient term to carry the title to the sea shores in the word "royalties"— the title to the sea shores being one of the royalties, so called, of the crown. *Barker* v. *Bates*, 13 Pick., 255. The

same word was contained in the charter granted to the freemen of this state by Charles II. A similar decision was made in New Jersey, in the case of *Martin* v. *Waddell*, which went to the Supreme Court of the United States and in that respect was affirmed—a majority of the court, by Chief Justice Taney, holding that the land under the navigable waters passed to the grantee, the Duke of York, as one of the " royalties " incident to the government. 16 Pet., 367. And the doctrine was re-affirmed by the same court in *Den.* v. *The Jersey Co.*, 15 Howard, 426. These are very persuasive decisions, and there are no conflicting ones ; and we are disposed to follow them, as resting upon a sound construction of the grants. But although (such being the true construction of the charter) the title to the " shores of the sea " vested in the freemen of the colony in trust for public use, before the King was excluded by the revolution and independence, it does not follow that the proprietors of the town of Norwalk ever acquired or had such title.

After the charter was granted, and in 1685–6, the proprietors of some of the towns desiring confirmatory grants from the Governor and Company, they were ordered for all the towns, and a form of patent, as it was called, adopted. That form may be found in the Colonial Records of Connecticut, volume 3d, page 117 ; and the grant made pursuant to it, to the proprietors of Norwalk, is in Hall's History of Norwalk, at page 38, and in the records of the town. None of these grants to the towns, however, contained the term " Royalties." In *East Haven* v. *Hemingway* the question arose whether the grant of the Governor and Company to New Haven conveyed the shores, and it was holden that it did not. The same question was again raised in respect to the grant to Middletown, in *Middletown* v. *Sage*, 8 Conn., 221, and a similar decision was made. All those grants followed the prescribed form, and were in the same terms, and it has thus been twice judicially settled that they conveyed no right to the shores of the sea. It is clear therefore that the proprietors of Norwalk never had title to the shore ; and we are not at liberty to presume that they attempted to convey it ; for

the act would have been unlawful, and they must be presumed to have been honest.

We have not overlooked the fact that the grants contained in the charter of Charles II, and those from the Indians and the General Court to the proprietors, contained the word "meadows," and undoubtedly embraced the *salt meadows* lying within their limits. But a sedge-flat lying upon the "shore" which bounds an arm of the sea, is not in any popular, legal or just sense a meadow. That term is applied to the tracts which lie above the shore, and are overflowed by spring and extraordinary tides only, and yield *grasses* which are good for hay. The sedge-flats on the contrary, lying below ordinary high water mark, are covered by every tide, and grow a coarse or long sedge, which cattle will not eat, and which, like sea-weed, is valuable only for bedding and manure. Moreover it is a part of the "sea shore," and none the less a part of the shore because covered with sedge. *Peek* v. *Lockwood*, 5 Day, 22.

Nor have we overlooked the fact that the court below found that the plaintiff was the owner of the sedge-flat. That finding does not import that any grant or allotment was ever made by the proprietors, for it is found that the plaintiff and his father, and Stephen Betts, have in succession occupied it exclusively as long as the oldest witnesses could remember, and that gave a title by possession against the state, and all claiming as riparian proprietors. But although, ordinarily, one acquiring a title to a lot of land bounded on a highway by adverse possession, gains to the center of the highway, that rule will not apply, (where there is not an exclusive occupation of the highway,) if the soil of the highway did not belong to the disseized owner of the lot. Here the state owned the shore, but did not own above high water mark; and those who have occupied the sedge-flat have had no exclusive occupation of the beach, and therefore could not gain a title to the latter by acquiring one to the former by disseizin. They belonged to different owners and one was not occupied, and a title acquired by occupation or use is commensurate with the user.

If these reasons did not forbid the presumption of an original grant from the proprietors, there would remain another difficulty. There is no proof or certainty that the sedge-flat existed two centuries or more ago, when the salt-meadows were granted to and allotted by the proprietors of the township. *Non constat* but that it was then a naked shore. Sedge grows on the shore of our harbors when a bed of mud is prepared for it by the resurging waves which carry back and deposit the fine suspended particles from the abraded shore. How long is it since that bed was prepared and sedge was transplanted by ice on the flat in question or sprung up there? No one has told us, and we cannot make any presumption on the subject. The records of the town may show that it was before the settlement of the town, and they may not. The land and meadows which lie above and beyond the shore and away from the action of the tides and currents and waves and ice, we can safely presume were then lands and meadows as now; but we can not presume that this sedge-flat then existed as such.

And there is still another difficulty. The meadows on the west side of the highway were allotted in severalty by the proprietors. How were they bounded? If by the harbor, as they may have been, the grant would carry the title *across the highway* to high water mark. That was also settled in *East Haven* v. *Hemingway*. But suppose that the grantees on the west were bounded by the highway. As the proprietors had no land on the east side of the highway did not those grantees take the entire soil of the highway? We are not aware that this question has been decided in this state, and it is not necessary to decide it; but it must be conceded that the views held by the leading judges in *Stiles* v. *Curtis*, 4 Day, 336, and *Peck* v. *Smith*, 1 Conn., 103, that " the proprietors cannot be presumed to have retained any title in reserved highways, but to have parted with all their interests when they granted the adjoining land," tend necessarily to such a result.

With these considerations pressing upon us, arising from the fact that the deed purports to convey a part of a sea-shore

only, we cannot hold that the plaintiff had any title to the beach above high water mark, and are of opinion that the east line of the highway was at high water mark, and that it was and is a public beach. The defendant had therefore a lawful right to enter upon it as he did, and is not liable as a trespasser for breaking and entering upon land of the plaintiff.

This view of the first branch of enquiry brings us to the second, namely, whether the defendant, at the time alleged, unlawfully took and carried away sea-weed belonging to the plaintiff.

On this part of the case the material and additional facts are substantially as follows. At the time when the trespass is claimed to have been committed an easterly wind had driven a considerable quantity of sea-weed upon the beach. The plaintiff had employed the person occupying the small tenement on the beach to heap up and take care of whatever weed should be blown up. Most of the weed 'then on the beach had been heaped up by him for the plaintiff above high-water mark. The defendant drove upon the beach and commenced loading up the weed. When partly loaded, the occupant of the shanty forbade him. The defendant thereupon gave him ten cents and he made no further objection, and the defendant gathered and took away a load of the weed. The defendant supposed he had bought the weed, but the occupant of the shanty had no authority to take the weed for his own benefit or sell it. The plaintiff expected and intended to gather and take the weed away for manure. It was not proved or found that the weed was piled up within twenty-four hours prior to the taking by the defendant.

The question has been raised in the case and fully argued, whether or not sea-weed, cast by the tide and waves on the land of a proprietor at or above high water mark, belongs to the owner of the land. The same question was raised in *Chapman* v. *Kimball*, 9 Conn., 38, but not decided. In *Emans* v. *Turnbull*, 2 Johnson, 313, it was determined that it did. Although the decision was made by a very distinguished court, and the opinion was given by Chancellor Kent, our

own court, in *Chapman* v. *Kimball,* evidently hesitated to follow it, and that fact has induced a careful examination of the grounds of that decision.

As the weed grows upon land to which no individual has title as against the public, which will give a title to it, and is detached by the waves, and floats with the currents of the sea, there is no individual title in it, and it becomes the property of the first occupant. The mere fact that it is cast like wreck upon the land of a riparian proprietor does not therefore give him title, and so the court in the case of *Emans* v. *Turnbull* impliedly admitted. But it is unlike wreck in this, that no person has ever had title before it is cast on the shore, and there is a seeming equity in giving it to the riparian owner on whose land it is cast. The court in that case were evidently influenced by that equity, and perhaps justly. But in some respects the principles by which they professed to be governed are questionable. Chief Justice Kent says, "The seaweed must be supposed to have accumulated gradually. The slow increase and its usefulness as a manure and as a protection to the bank will, upon every just and equitable principle, vest the property of the weed in the owner of the land. It forms a reasonable compensation to him for the gradual encroachments of the sea to which other parts of his estate may be exposed; this is one sound reason for vesting these maritime increments in the proprietor of the shore. The *jus alluvionis* ought in this respect to receive a liberal encouragement in favor of private right." Now neither the slow increase, nor its usefulness as manure, makes sea-weed *alluvion.* It grows indeed and becomes an article capable of ownership slowly and imperceptibly, but it is not *so added to the shore.* It is most commonly detached during violent storms or strong winds when the tide is low, and visibly driven in masses up the shore as the tide rises again. The *"jus alluvionis"* attaches to *soil,* earth of a solid substantial character, which makes a permanent addition to the land by imperceptible accretion, and it is a departure from principle to attach it to vegetable matter which will decay and be dissipated in a few months. Nor can the *jus alluvionis* attach to it because it is

useful as manure, though the fact undoubtedly creates an equity in favor of the riparian proprietor. As a "protection to the bank," and favoring and assisting the deposit of alluvion, however, it is, if left for that purpose, undoubtedly useful, by receiving and retaining the suspended particles of the abraded shore which would otherwise be carried away by the resurging waves, and by reason of that fact the deposit may be brought within a liberal interpretation of the *jus alluvionis*, and save that decision from the character of judicial legislation.

The decision however establishes a rule where one did not exist and was needed; and although it favors the riparian proprietor, it does injustice to no one. And it may be sustained also without a serious departure from principle, if we look at the fact that the weed, when cast upon the land, belongs to no one, and the owner may justly as well as equitably be deemed the *first occupant.* The decision has been followed in Massachusetts and elsewhere, *Phillips* v. *Rhodes*, 7 Met. 322, and there being none the other way, we are disposed to follow it also, for the sake of uniformity and certainty in respect to a matter of growing importance.

But this does not aid the plaintiff. He is not a riparian proprietor, and did not own the beach on which the weed was cast.

Nor is this branch of the plaintiff's case supported by the other facts found. The legislature have undertaken to regulate the title to sea-weed which can be acquired by occupancy, where it is cast on a public beach, as this was; and have said that the first occupant *shall not have title*, unless he *removes* the weed within twenty-four hours. The plaintiff heaped up the weed, but did not remove it within that time. It is of no importance that he had a servant to *watch* it. The statute requires that he should *remove* it.

Nor is it material whether or not the agent sold it. He ceased to object to the taking and intentionally *abandoned* it, and left the defendant free to take it pursuant to the statute.

For these reasons we have come to the conclusion that the action cannot be maintained, and so advise the superior court.

In this opinion the other judges concurred.