PROVIDENCE STEAM-ENGINE COMPANY *vs.* PROVIDENCE AND STONINGTON STEAMSHIP COMPANY *et als.*

A riparian owner platted his land into streets, lots, and a square, and made on the plat a declaration, sealed and acknowledged, that the square, streets, and gangways were equally appurtenant to each of the lots, and that the grantees of the lots were equally entitled to use and occupy the square, streets, and gangways.  When platted one of the streets was below high-water mark.  It was subsequently filled out and made, and afterwards closed by B., who had purchased all the lots adjoining this street.

A., owning by purchase other lots on the plat, filed a bill in equity against B. to compel him to reopen the street.  B. objected to the bill : 1. That the platted lay out of the street being over tide-water was invalid.  2. That owning all the adjoining lots he was entitled to close the street.

*Held*, that neither of these defences could avail.

*Held*, further, that B., holding under conveyances made with reference to the plat, was estopped from denying the validity of the lay out.

*Held*, further, that the street being appurtenant to the lots of the complainant, as well as

EXHIBIT,

Reduced.

to those of the respondent, and leading to tide-water, the respondent could not deny the the complainant's interest in the street.

Rights of owners on the Fox Point Association Plat to the square, streets, and gangways defined.

BILL IN EQUITY praying for the removal of an obstruction in an alleged street, and for an injunction.

The pleadings and an agreed statement set forth the facts as stated in the opinion of the court. The answer contains three defences : 1. That the lay out of the street over public tide-waters, as made by the trustees of the Fox Point Association on their plat, was invalid, 2. That the ownership by the respondents of all the adjacent lots entitled them to close the street as laid out, 3. That the respondents and their predecessors in title had enjoyed uninterrupted, peaceful, actual, and exclusive possession of the alleged street for more than twenty years. The respondents claimed the benefit of the first two defences as if by a demurrer to the bill, and demanded a jury trial of the issues of fact involved in the third. The case was heard on the validity of the first two defences under a stipulation signed by the solicitors of the litigants, which reserved the third defence and the right to set up under it any title not derived from the trustees of the Fox Point Association. The position of the realty in question is shown on the plat annexed.

*George H. Browne & Charles H. Parkhurst*, for complainant.

1. The Harbor Line Act of October, 1815, adopted and fixed certain lines which had been before agreed upon by the freeholders of the town of Providence in town meeting.

Since 1815, the State has never claimed the land between the former shore and the harbor line then established. The Harbor Line Act, if not in terms an absolute grant of the soil by the State to the riparian proprietors, was at least a license from the State to such proprietors to fill the tide-flowed lands from the shore or high-water mark to such harbor line. This right to fill was the subject of grant by the riparian proprietors. The trustees of the Fox Point Association assumed the right, the State not interfering, in 1816 to convey absolutely by deed the lots then covered by tide-water, including lots 13 to 22, inclusive, and many others, as delineated on the plat ; and conveyed these lots, 13 to 22, inclusive, as they were marked out on said plat, by their respec-

tive numbers, and, as shown on the plat, they bound upon the street or way delineated upon the plat.

The grantees of the Fox Point Association, if they took nothing else by their deeds, certainly acquired by those deeds the right to fill the lots described in such deeds. The Fox Point Association would be estopped by their deeds from claiming the right to fill these lots themselves, or from asserting any title to such lots; and their grantees having purchased lots bounding on a street as shown on the plat, would equally be estopped to deny the existence of the way or street.

It is clear, therefore, that when the various grantees of the tide-flowed lots bounding on this street, as delineated upon the Fox Point Association Plat, filled these lots, and the way or street adjoining them, they filled under and pursuant to that plat; and that when they filled the street or way adjoining lots 13 to 22, they filled it for a street or way, and that such way did not become private property, but became precisely such a street or way as the other streets and ways marked out on said plat, and was within the terms of the declaration of dedication written upon the plat.

The trustees of the Fox Point Association were the riparian proprietors. The legislative assent to their appropriation of the land between high-water mark and the harbor line, had already been given; and hence the doctrine that a private way or public highway cannot be laid out over tide-flowed land, has no application. *Peck & Salsbury* v. *Prov. Steam-Engine Co.* 8 R. I. 353; *Engs* v. *Peckham*, 11 R. I. 210; *People* v. *Lambier*, 5 Denio, 9; *Jersey City* v. *Morris Canal Co.* 12 N. J. Eq. 547; *Henshaw* v. *Hunting*, 1 Gray, 203; *Simons* v. *French*, 25 Conn. 346; *Storer* v. *Freeman*, 6 Mass. 435; *Gerrish* v. *Proprietors of Union Wharf*, 26 Me. 384.

2. Supposing the street or way in controversy to have been lawfully established, has it become extinguished by reason of the exclusive ownership by the respondents of lots 13 to 22, inclusive? The plain answer to the question is found in the declaration made by the trustees, and recorded with their plat, prior to making any sales of lots, as follows: " All the square, streets, and gangways are equally appurtenant to each and every of said lots, and each and every of the grantees of the same are equally entitled to use

and occupy said square, streets, and gangways as such at all times." So that no unity of title to less than the entire number of lots on said plat could give to the respondents the right to exclude the complainant, the owner of other lots on said plat, from the use of said street south of India Street, as all these streets were declared to be appurtenant, as well to the complainants' lots as the respondents'.

*Benjamin F. Thurston & James M. Ripley,* for the respondents.

1. The instrument executed by the trustees upon the face of the plat was wholly inoperative, and of no force or effect, to create the easement of a way, in dispute. (*a.*) The *locus,* at the time of the making of the plat and the execution of said instrument, and the conveyance, by said trustees, of said adjoining lots having been below high-water mark, the fee in the soil thereof was in the State. *Bailey* v. *Burges,* 11 R. I. 330; *Martin* v. *Waddell,* 16 Pet. 367. (*b.*) The establishment of the harbor line in the year 1815 had no effect upon the title to the shore or flats, until reclaimed; but simply conferred upon the said trustees, as riparian owners, the right to fill out to the line established. Until reclaimed, the title remained in the State. *Engs* v. *Peckham,* 11 R. I. 210, 224; *State* v. *Jersey City,* 25 N. J. Law, 525; *People* v. *Ward & Kelsey,* 14 Ab. Pr. 372; *East Haven* v. *Hemingway,* 7 Conn. 186, 202; *Chapman* v. *Kimball,* 9 Conn. 38, 40; *Nichols* v. *Lewis,* 15 Conn. 137, 143; *Lockwood* v. *N. Y. & N. H. R. R. Co.* 37 Conn. 387, 391. (*c.*) The said trustees having no title to the soil over which the supposed way was laid on said plat, but the same being below high-water mark, and flowed by tide-water, their dedication of the same, by the instrument on the plat as a way for their grantees, was inoperative and void. *Simmons* v. *Mumford,* 2 R. I. 172, 184; *Inhabitants of Arundel* v. *McCulloch,* 10 Mass. 70; *Inhabitants of Charlestown* v. *County Commrs. of Middlesex,* 3 Met. 202; *Commonwealth* v. *Inhabitants of Charlestown,* 1 Pick. 180; *Kean* v. *Stetson,* 5 Pick. 492, 494; *Richardson* v. *The City of Boston,* 19 How. U. S. 263, 269.

2. But even if the river-bed over which the said most westerly street was laid out on said plat had been upland, and the said instrument on the plat therefore effectual to establish such supposed way, such easement would now, upon the facts submitted, have become extinguished, for the title to all of said lots 13, 14, 15, 16,

17, 18, 19, 20, 1, and 22, now having become vested in the respondent, the purpose for which such easement was created no longer exists, and the use and enjoyment thereof is no longer of any practical utility or avail. Washburn on Easements and Servitudes, *532, *523, *529; *Hancock* v. *Wentworth*, 5 Met. 446; *Mussey* v. *Proprietors of Union Wharf*, 41 Me. 34; *Mott* v. *Mott*, 8 Hun, 474.

3. Assuming, again, that the supposed way was lawfully created, then, even if the union of the title to all of said lots, 13 to 22, in the respondent, did not work an extinguishment of said way, the case made by the complainant is not such that a court of equity will interpose by injunction. An injunction against a private nuisance will be granted only where the plaintiff would otherwise suffer an irreparable injury, and upon a bill setting forth the facts from which such injury may be seen; and the same will not be granted where the property or rights interfered with are of slight use to the plaintiff. Washburn on Easements and Servitudes, *577; *Clack* v. *White*, 2 Swan, Tenn. 540; *Amelung* v. *Seekamp*, 9 Gill & J. 468; *Roman* v. *Strauss*, 10 Md. 89; *Shipley* v. *Caples*, 17 Md. 179; *Earl of Ripon* v. *Hobart*, Coop. t. Brougham, 333; *Wingfield* v. *Crenshaw*, 4 Hen. & M. 474; *Van Winkle* v. *Curtis*, 3 N. J. Eq. 422, 426; *Lexington City Nat. Bank* v. *Guynn*, 6 Bush, 486; *Jerome* v. *Ross*, 7 Johns. Ch. 315. The use of the way in question in this suit is in no way necessary, or even convenient, for any purpose connected with the use or enjoyment of the lots owned by the complainant on the plat.

4. The case of *Peck & Salsbury* v. *Providence Steam-Engine Company*, in this court, reported in 8 R. I. 353, in which the effect of the Fox Point plat and the instrument upon it came in question, and the cases of *Jersey City* v. *Morris Canal Co.* 12 N. J. Eq. 547, and *The People* v. *Lambier*, 5 Denio, 9, cited therein (p. 357), in no way conflict with the respondent's position. In the two latter cases the streets in question had an actual existence upon upland before the filling out in front of the same, and the parties complaining had a vested right of way over the same to the water, while in this case the supposed most westerly street was, when laid out upon the plat, purely an imaginary one, located wholly upon land flowed by tide-water, the title to which land was then in the State, and so remained until the land was

reclaimed, which was not until after the said trustees had parted with their title to the upland lots adjoining the shore back of the same, no part of the same ever being reclaimed by said trustees. The case of *Jersey City* v. *Morris Canal Co.* arose under a still different state of facts from that in the present case or the two others last mentioned. The same case below, is reported in the same volume, 12 N. J. Eq. 252 ; and the material questions involved also received consideration, and were adjudicated in the same court, in the previous case of the *Associates of the Jersey Company* v. *The Mayor, &c. of Jersey City*, reported in 8 N. J. Eq. 715. In both of these cases the court held that Hudson Street, delineated upon the plat of the Associates of the Jersey Company, the entire extent of which street was at the time of the making of the plat covered by the tide-water of the Hudson River, was effectually laid out and created a street by force and virtue of the plat. But this decision was based upon the fact that the Associates, &c., were, by virtue of a grant from the legislature, the owners of the platted land covered by tide-water, and were moreover expressly empowered by the act, which granted to them the land in question, to lay out the same into streets.

*July* 19, 1879. DURFEE, C. J. This is a bill in equity to abate a nuisance or obstruction to an alleged street or right of way at India Point in the city of Providence. In 1811 the land on India Point belonged to the Fox Point Association, so called, being vested in trustees for the association. In 1815 the harbor line in front of it was established. In 1816 the trustees caused a plat to be made embracing the upland and the land below high-water mark out to the harbor line, and dividing the entire tract into lots, squares, streets, and gangways, designating the lots, upward of one hundred and sixty in number, by letters A to K and by numbers 1 to 153. The trustees inscribed on the plat, under their hands, seals, and acknowledgment, the following declaration, to wit :

" Know all men whom it may concern, that all and singular the within numbered lots are sold and conveyed by us, the undersigned, trustees of the Fox Point Association, in manner following, that is to say : All the squares, streets, and gangways are equally appurtenant to each and every of said lots, and each and every the grantees of the same are equally entitled to use and oc-

cupy said square, streets, and gangways as such at all times, excepting that the grantees of all and singular the water lots, their heirs and assigns forever, shall have the exclusive right to demand and receive wharfage for all the streets and gangways adjoining to their several lots respectively, and each and every the grantees of the water lots, on the west and south sides of said plat, beginning at lot number one and ending at lot number twenty-two, inclusively, their heirs and assigns forever, shall have the sole right to use and occupy the several pieces of land west of the street, adjoining their several lots respectively, for all purposes, excepting that they nor either of them shall not, at any time ever hereafter, have the right to erect any permanent building on said pieces of land or either of them, and the grantee of lot number twenty-two, his heirs and assigns forever, shall have the same right to use and occupy the land south of said lot adjoining said street, subjected to the same restriction as aforesaid."

The plat was afterwards recorded, and all the lots designated on it were sold from time to time   The lot designated as lot A, and a portion of the lot designated as lot 56, became the property of the complainant, which continues to own them.   Lots 13 to 22, inclusive, became the property of the defendants, who continue to own them.

The bill does not expressly allege that the lots were conveyed under and by reference to the plat, nor does it anywhere appear that such was the fact.   We infer, however, from the manner in which the case was submitted to us, that it was supposed we would take it for granted that the conveyances were so made, and accordingly we shall do so.

The alleged street or way here in controversy was among the streets or ways designated on the plat.   It was, when platted, below high-water mark, and of course existed at that time only on paper.   The land over which it was delineated has since then, and after conveyance, been reclaimed from tide-water by filling out the upland.   It lies over or along the front of lots 13 to 22, conveyed to the defendants, said lots being situated at the extremity of India Point, on or near the side of the harbor.   The defendants have erected a fence across it, thereby obstructing access to and travel over it.   The complainant contends that this

is an interruption of its right of way and has brought this suit to get the fence removed.

The defendants interpose among other defences the two following, to wit: *first*, that the street or way was never lawfully created, because at the time of its alleged creation the land over which it was laid was flowed by tide-water; and *second*, that if it was lawfully created, the part of it lying along or over lots from 13 to 22, inclusive, has become extinguished by unity of title or ownership of these lots.    The only question now submitted to us is whether these two defences, or either of them, is valid.

We think the first defence, to wit, that the way or street was never lawfully created, cannot be maintained; for though it may be true that the way or street had no actual existence when the conveyances under which it is claimed were made, we think it had nevertheless what may be called a potential or prospective existence, which would become actual whenever the place for it should be filled and incorporated with the upland, and though the conveyances when executed may have been ineffectual to create the way or street, because the site of it was flowed by tide-water, yet we think they were binding by way of estoppel on parties and privies, so that in equity, at least, the said parties and privies could not refuse to allow the way or street as soon as the land designated for it became capable of supporting it.    The ground of the estoppel is, that the easements and servitudes indicated by the plat constitute a part of the consideration for which all conveyances referring to the plat are made, and therefore no person, while claiming under the conveyances, can be permitted to repudiate them or to deny that they exist where they are capable of existing.

In coming to this conclusion we make little account of the Harbor Line Act.    The ostensible purpose of that act is not to confer any new right, title, or interest on the riparian proprietor, but only to prevent his encroaching too far on the space required for the harbor.    It amounts simply to a license to him to fill out to the harbor line, or to an implied declaration that in filling out to it he will commit no encroachment.    To hold that it amounts to more would be doing violence to the act, especially in view of the rule that such acts are to be strictly construed, or are to be con-

strued most liberally in favor of the State. See the decision of the Supreme Court of the United States in *Charles River Bridge* v. *Warren Bridge et als.* 11 Peters, 420.

The second defence is, that the way, if ever lawfully created, has become extinct, the title to the several lots over which it is laid having become vested in the same owner. We do not think the defence can avail. The way is appurtenant to other lots than those over which it is laid, and among them to the lots belonging to the complainant. The way over the lots belonging to the defendants connects with tide-water, and therefore it cannot be said that the complainant has no interest in the way because the lots over which it is laid all belong to the defendants; for the complainant may want to use it as a way to tide-water, which belongs to everybody.

POTTER, J., concurring. I concur generally in the results at which the majority of the court has arrived.

The facts necessary to the decision of the questions now before us can be stated very briefly.

The trustees of the Fox Point Association, claiming to own certain land and adjoining shore rights and water lots, caused the same to be platted in 1816 in lots for sale and with certain streets laid out thereon. The complainants own lots A and 56 on said plat; the respondents now hold lots 13 to 22 inclusive. The complainants claim that the respondents have without right shut up a certain street upon said plat. It is agreed that said street and all the lots held by the respondents were at the time under water and were not filled up until 1820, and then by the purchasers of said lots and not by said trustees.

Did said street ever have a lawful existence, and if so, has it become extinguished by unity of possession?

It is contended by the respondents that the said platting and conveyance of lots and of any rights in any supposed streets was totally invalid as to that portion of the platted land then under water.

In all questions relating to our shores a very important preliminary consideration is, whether the English common law upon this subject was ever adopted here in its full extent. By the Patent of 1643, the laws were to be " conformable to the laws of England so far as the nature and constitution of the place will admit."

By the Code of 1647, it was voted to "receive and be governed by the laws of England, together with the way of administering of them so far as the nature and constitution of this plantation will permit." The laws of Oleron were adopted, and the recorder was required to keep "the general purchases, which are all we can show for our rights to our lands," and the charter which gave a right to exercise authority. It is well known that our ancestors claimed to hold their lands by purchase from the native proprietors and not by grant from the Crown.

The Charter of 1663 used substantially the same language as the Patent of 1643. It is very evident that, however, as a matter of policy, they may have adopted the usual language of charters, they really considered it as a charter of government only, for they had already purchased nearly all the land before, and the remainder they purchased of Ninigret afterwards, and did not claim to hold it of the King.

There is a great difference in the character of the shores of the two countries. And as to the rivers, there are but few rivers in England which would be navigable but for act of parliament, and the repair of their banks and their navigation are regulated by statute. So also in many cases as to marshes. See *Ball* v. *Herbert*, 3 Term Rep. 253; and as to Rumney Marsh, see 4 Institute, 276, 277.

To apply the common law doctrine strictly would require us to hold that all the marshes in the State belong to the State; yet from the very first settlement, although flowed by the tide, they have always been recognized as private property, platted and sold as such, taxed as such, and the State has made provision by statute for exempting them from the fence laws, for the very reason that they are overflowed by the tides.

See also as to sedge flats in Connecticut, *Church* v. *Meeker*, 34 Conn. 421.

Again it is important to inquire into the nature and extent of the right, formerly of the Crown, now of the State, in the shores.

The shore in the common law includes only the space between ordinary high and ordinary low-water mark.

The true doctrine seems to be, as the result of the decisions, that the State has the governmental control of the shores and tide-waters for the benefit of the public, in order to protect the

public rights of passage or other rights on the shore, and to protect the navigation. Angell on Tide Waters, 27, and cases cited.

It was the policy of the English law, and especially of the feudal system, to consider the King as the original owner of all the lands, &c:, in the kingdom. Hence he was the owner of all vacant lands, derelict, &c. All was held of him and escheated to him. So he is spoken of as the owner of the shore.

But the King of England held the shores only as trustee for the public. That he had undertaken to grant away portions of the shore as private property, and to exclude the general public from their rights in it, was one of the grievances complained of and attempted to be redressed by Magna Charta. Parliament, according to the theory of the English Constitution, was omnipotent, but the King was not.

The King's right of soil was subject to the public right, and any grantee of the crown held subject to that. *Mayor of Colchester* v. *Brooke*, 7 Q. B. 339, 374 ; 9 Jurist, 1090.

Hale distinguishes three sorts of rights in ports and shores : first, the "*jus privatum;*" or right of property or franchise ; which was always subject to second, the "*jus publicum,*" or public right of passage and navigation ; and third, the "*jus regium,*" or governmental right, the right of superintendence and control.

It has been very common to speak of the right of the State in the shores as a fee. This is proper only by analogy. To hold that the State owns the shores in fee in the same sense in which it owns a court-house or a prison, or in which the United States own public lands, or a citizen may own land in fee, would lead to consequences which need only to be considered in order to show that such can never have been the nature of the right. Angell on Tide Waters, 24.

During our Revolutionary War and the distressful times which followed it, if the State had owned the fee of this valuable property it could not have escaped a sale. Town treasurers were committed to jail for the non-payment of nearly every state tax that was ordered, and yet no town nor person ever thought of this as a property which the State owned in fee, or could sell to lessen taxation.

To hold that the State holds the fee of the shore in such a

sense that it can sell the shores would deprive nearly half of the land in this small State of a large portion of its value derived from bounding on the shore. The city of Newport is the owner of Easton's Beach. For the State to sell the shore would take away almost its whole value.

As there is no statute of limitations against the State, especially so far as public rights are concerned, the State would still own large tracts of filled lands in Providence, Newport, and other towns, unless the State has done some act which would justify the courts in holding it to be private. And even if the private title to land so filled should be held good, the State might still sell out a strip of land at the head of any wharf and so cut off the owner from navigation. It might sell off the whole shore so as to cut off the present owners from access to the water.

The monstrous injustice that would result if such a doctrine was established as law is enough to show that it ought not to be recognized as law.

And such, I think, is not the meaning of the courts. They have often enough held that the property of the King, and with us of the State, is a trust for the public, a power to control and regulate, to subserve the good of the public, and not a private property. Says Kent, the King in England, and here the State, is trustee for the public; 3 Kent Comm. *427; and the Supreme Court of the United States has on several occasions held the same language. *Mayor, &c. of Carlisle* v. *Graham*, 18 W. R. 318; *Commonwealth* v. *City of Roxbury*, 9 Gray, 451, 482, 483; *Commonwealth* v. *Alger*, 7 Cush. 53, 65; *New Orleans* v. *United States*, 10 Pet. 662, 699, 702; *Simons* v. *French*, 25 Conn. 346, 352; *Church* v. *Meeker*, 34 Conn. 421, 427, 428; *Clement* v. *Burns*, 43 N. H. 609, 620. In the last case the court says that the doctrine that the title is exclusively in the sovereign has never been fully received in the American courts.

And so in Scotch Law. Bell's Principles, § 642.

The language of the English decisions to the effect that the King holds as trustee for the public is very strong. *Company of Free Fishers* v. *Gann*, 20 C. B. N. S. 1 (115 Eng. Com. Law, 803); *Gann* v. *The Free Fishers of Whitstable*, 11 H. L. 192; *Mayor of Colchester* v. *Brooke*, 7 Q. B. 339. The King's right of soil is "subject to the public right of passage, however ac-

quired, and any grantee of the Crown must of course take subject to such right," says Lord Denman, in the last cited case, p. 374. *Blundell* v. *Catterall*, 5 B. &. A. 268, 287, 294, 304-9 ; *Duke of Buccleuch* v. *Metropolitan Board of Works*, L. R. 5 H. L. 418.

The form of an information by the Attorney General of England is given in *Attorney General* v. *Richards*, 2 Anst. 603. It alleges that the shore belongs to the King, and ought to be preserved for the public use, and that the King has the right of superintendency for that purpose. It is true that in arguing the case the attorney general used the usual arguments as to the rights of the Crown in the shore.

In *Commonwealth* v. *City of Roxbury*, 9 Gray, 451, 482, 483, the court recognizes and approves the rule it had before laid down in *Commonwealth* v. *Alger*, 7 Cush. 53, 65, that the title to the flats was in the King, and " that it was so held by him for public uses. This rule, apparently so well settled and established, both in England and in this country, seems to us not to have been shaken or doubted in any recent English case," &c., &c. The King held the sea-shores as well as the land under the sea ; he held the same *publici juris* for the use and benefit of all the subjects for all useful purposes, &c.

In *Smith* v. *The State of Maryland*, 18 How. U. S. 71, 74, which was a case of oyster laws, the United States Supreme Court says the right of soil is in the State. " But this soil is held by the State, not only subject to, but in some sense in trust for, the enjoyment of certain public rights," &c. See also *Barney* v. *Keokuk*, 4 Otto, 324 ; *Martin* v. *Waddell*, 16 Pet. 367, 410, 423. " When it is said that the sovereign is the owner of the sea-shore, it is meant that the legal title is in him, not for his exclusive use and profit, but in trust for the common benefit of all his subjects," per Thatcher, J., charging the jury in *Commonwealth* v. *Wright* ; Angell on Tide Waters, 207 ; 3 Amer. Jurist, 185. And in the great case of *Arnold* v. *Mundy*, 6 N. J. Law, 1, 71, 77, the court fully discusses the English cases. And it holds that while the title to the common property must be considered as vested in the sovereign, it is to be " held, protected, and regulated for the common benefit." The property indeed, strictly speaking, is vested in the sovereign ; but it is vested in him " not for his own use, but for the use of the citizen," &c.

This case was for an oyster fishery. See *Bell* v. *Gough*, 23 N. J. Law, 624. And in *Gough* v. *Bell*, 22 N. J. Law, 441, the Supreme Court of New Jersey, by Green, C. J., lays down the same doctrine that the King held as trustee, and that his grants were subject to all public rights.

The language of many of the decisions can be reconciled by holding that while the State does not own the shore in fee, properly speaking, and therefore cannot sell the shore to be held as private property, and so cut off the riparian owner from the water, it has the complete regulation and control of it for public purposes.

In several cases very strong language has been used, to the effect that there can be no private riparian right in tide-flowed land, and that if a railroad cuts off the riparian owner entirely from the water, he has no remedy and no claim to compensation. Most of these decisions, and those going the greatest length, have been made in States peculiarly situated as to railroad corporations. See *Gould* v. *Hudson River R. R. Co.* 6 N. Y. 522; *Stevens* v. *Paterson & Newark R. R. Co.* 20 N. J. Eq. 126; 34 N. J. Law, 532, 544, 566; to the same effect is *Tomlin* v. *Dubuque, Bellevue & Miss. R. R.* Co. 32 Iowa, 106, which relies on the last two cases.

Some of these cases have been severely criticised. Cooley Constit. Limit. 544, note 1, remarks of them: " So far as these cases hold it competent to cut off a riparian proprietor from access to the navigable water, they seem to us to justify an appropriation of his property without compensation; for even those courts which hold the fee in the soil under navigable waters to be in the State admit valuable riparian rights in the adjacent proprietor;" and see also 11 Albany Law Journal, 19.

And I think the extreme rights claimed for the State by these decisions are in conflict with the general course of decision in other States, and with many cases in New Jersey itself. See, besides those before referred to, *Stockham* v. *Browning*, 18 N. J. Eq. 390, where it was held that the riparian owner could not maintain ejectment, but that, nevertheless, he had an inchoate right in the shore which equity would protect.

Before the decisions in New Jersey in the several cases of *Gough* v. *Bell*, it had been the common notion in New Jersey

that through the grant from the King to the Duke of York and from him to the first proprietors, the land under tide-water and under Raritan Bay had been conveyed, and through them to the riparian owners, and this fact is necessary to the proper understanding of the cases and opinions.   See 3 Kent Comm. *416. And in *Bell* v. *Gough*, 23 N. J. Law, 624, 655, Elmer, J., commenting on the argument advanced by counsel, that in *Martin* v. *Waddell*, 16 Pet. 367, the United States Supreme Court had decided that the soil below high-water mark was exclusively in the sovereign, and that the riparian owner had no right in it, said that this was not true.   The plaintiff in that case did not claim as riparian owner, but under the proprietors' grant he claimed the land itself under Raritan Bay for an oyster fishery, and the question was whether the Jersey proprietors ever had any title to convey.   The United States court held that by their charter they had only the sovereign rights of the crown, which could not be transferred as private property.

When the case of *Gough* v. *Bell*, 22 N. J. Law, 441, came before the Court of Errors as *Bell* v. *Gough*, 23 N. J. Law, 624, in June, 1852, the decision was unanimously confirmed, and some of the judges expressed very strongly the view I have here taken as to the riparian right to wharf out and occupy, and that it was a sort of customary law there.   23 N. J. Law, 678, 685, 688, 695, 702.

In Massachusetts, and Sullivan says in New Plymouth, the Ordinance of 1640 extended the riparian rights over the flats. The principles of this ordinance were adopted in New Hampshire, though the ordinance never extended thither.   Sullivan on Land Titles in Massachusetts, 284.

But it is probable that this ordinance only recognized and validated an existing usage.   Sullivan, Land Titles, 285, says : " From the first settlement of the Colony of Massachusetts, that government practised upon the principles of this provision."   And Angell, Tide Waters, 225, says, that although the ordinance was afterwards annulled the usage continued, and now has the force of common law, quoting the words of the Supreme Judicial Court in *Storer* v. *Freeman*, 6 Mass. 434, 438.   And that this common law extended to the sea-shore as well as to coves, &c., was settled in subsequent cases there cited, although the words of

the ordinance did not plainly extend to the sea-shore. And see the cases cited by Angell, Tide Waters, 234 : *i. e. Commonwealth* v. *Charlestown*, 1 Pick. 180 ; *Commonwealth* v. *Pierce*, 2 Dane's Abridg. 696, recognizing the common practice to wharf out to low-water mark, or further if it was not injurious to navigation.

In this State it has always been understood that the riparian owner has the right to wharf or embank against his land, and so make land from tide-water, and this without license, provided he does not interfere with the navigation. It was so stated by Mr. Angell in the first edition of his work on Tide Waters, in 1826, repeated in the subsequent editions, and this portion of his work has never been adversely criticised. In very few instances was there any legislating by the State, and notwithstanding the common practice of wharfing and filling, it is believed there has never been an instance of the State interfering to prevent it. There has, indeed, been a good deal of legislation regulating the Long Wharf in Newport.

The State never undertook to regulate this right till 1815, and then did not profess to grant a right, but only to prevent encroachment to save the harbor ; and it is noticeable here that the business was first taken up in town meeting, and a committee of five of the most respectable citizens appointed, men old enough to be well acquainted with the usages of our ancestors and the shore rights claimed by them, and who died before most of the present members of the bar were born. And this committee reported that in their opinion " the rights of individuals have been extended beyond the original intention of the proprietors when the lots were first laid out, as appears by plats," &c. And the town proceeded to vote in town meeting that the plat reported by the committee be " established as containing the boundary lines of the harbor aforesaid," and for greater security that application be made to the General Assembly.

Up to 1815, we had no Harbor Line Act, and for a large portion of the shore have none now. But no Rhode Islander ever thought he was obliged to petition the General Assembly for leave to build a wharf on his own land, and the records of our General Assembly and courts will, we think, be searched in vain for any attempt to interfere with this privilege so generally used.

From the very first settlement of the State, our people have

claimed and held property in tide-waters. And as I have said, the State regulated the fencing of marsh land in June, 1834; the marsh lands of the Woonasquetucket River in October, 1804; and again recognized the ownership in 1861. Pub. Laws, cap. 362. And the Providence purchasers exercised complete control over their thatch lots.

In 1773, the Providence purchasers granted to the Baptists several acres in the cove, where the Worcester freight depot now is. They granted to the State a jail lot, covered by salt water (minutes of Judge Staples). If the State owned the tide-flowed land in fee, there was no need of this; nor was there any need, when they sold the jail lot to the city, of obtaining a release from the proprietors. See Acts and Resolves of General Assembly of October, 1825, p. 63; October, 1828, p. 70; January, 1838, p. 68, Bridgham and Carrington, committee; June, 1838, p. 4, George Curtis's committee. And the committee of the proprietors of the grand purchase to convey the lot to the State were James Fenner, Zachariah Allen, and Joseph L. Tillinghast. Some of these men, probably, knew something about the old usages of Rhode Island.

The State itself has sold large tracts of land bounding on the sea, confiscated in the Revolution, where, probably, half the value consisted in its sea frontage. It has received the money and put it into the public treasury, and saved the people from so much taxation, and the owners have ever since been taxed for this additional value.

And the fact that from the first settlement of the State, down to 1815, no act was ever passed even to limit and restrain this ancient practice, is significant. The Harbor Line Act of 1815 does not profess to grant any rights, but only to prevent encroachments by wharves beyond the established line. The Amendatory Act of January, 1837, was of the same character. The Act of October, 1841, forbade the erection of any wharves in the cove above the bridge, except under the direction of the city authorities.

The right to wharf out or reclaim is a valuable right even before its exercise. It constitutes a part of the value and sometimes nearly the whole value of the upland. In *Martin* v. *Waddell*, 16 Pet. 367, 414, Taney, C. J., says: " The men who first formed the English settlements could not have been expected to

encounter the many hardships that unavoidably attended their emigration to the New World, and to people the banks of its bays and rivers, if the land under the water at their very doors was liable to immediate appropriation by another as private property, and the settler upon the fast land thereby excluded from its enjoyment and unable to take a shell fish from its bottom, or fasten there a stake or even bathe in its waters, without becoming a trespasser upon the rights of another."

In *Bowman's Devisees & Burnley* v. *Wathen*, 2 McLean, 376, 382, which was a case on the Ohio River, McLean, J., after holding that the English law as to the navigableness of streams has no application in this country and does not depend on the ebb and flow of the tide, goes on to say : " It is enough to know that the riparian right on the Ohio River extends to the water, and that no supervening right, over any part of this space, can be exercised or maintained without the consent of the proprietor. He has the right of fishery, of ferry, and every other right which is properly appurtenant to the soil. And he holds every one of these rights by as sacred a tenure as he holds the land from which they emanate. The State cannot, either directly or indirectly, divest him of any one of these rights, except by a constitutional exercise of the power to appropriate private property for public purposes."

In *McManus* v. *Carmichael*, 3 Iowa, 1, an action of trespass was brought against the defendant for taking sand from the shore against the plaintiff's land. After a very full discussion the court held it was no trespass, but expressly says that it does not mean to say that the riparian owner does not possess peculiar rights, and that he might not have a remedy by action of the case or by indictment.

In *Yates* v. *Milwaukee*, 10 Wall. 497, 504, the United States Supreme Court, by Miller, J., held that whether the ownership extends beyond the land or not, this riparian right is property, and is valuable, and though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired. It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and, if necessary that it should be taken for the public good, upon due compensation. And the court refers to *Railroad Co.* v. *Schurmeir*, 7 Wall. 272, and *Dutton* v. *Strong*, 1 Black, 23.

In *Webber* v. *Harbor Commissioners*, 18 Wall. 57, the court says it recognizes the correctness of the rule as laid down in *Yates* v. *Milwaukee*, 10 Wall. 497. In that case the legislature had granted to the city the right to wharf out at the ends of all the streets, and the defendant, who had erected a wharf, was not a riparian owner. And the court makes a distinction as to statutes of limitation, as concerns the State, between lands it holds as private proprietor and lands it holds as sovereign in trust for the public.

In Wisconsin, in *Chapman* v. *Oshkosh & Miss. R. R. Co.* 33 Wis. 629, where the riparian front was cut off by a railroad, the court, by Cole, J., consider the decisions in *Gould* v. *Hudson River R. R. Co.* 6 N. Y. 522, and in *Tomlin* v. *Dubuque, Bellevue & Miss. R. R. Co.* 32 Iowa, 106, unsound; and in *Delaplaine* v. *The C. & N. W. R. R. Co.* 42 Wis. 214, they approve and follow their former decision, holding that the riparian owner on a navigable river has rights therein differing in kind and degree from the rights of the public. He has the right of access to and from his land, and to all the facilities which the location of the land gives him, and this although the water's edge is the boundary of his title. And they quote and approve the language of the English decision in *Lyon* v. *Fishmongers' Company*, L. R. 1 App. Cas. 662. And in *Diedrich* v. *The N. W. U. R. R. Co.* 42 Wis. 248, 264, the court approve the decision in *Chapman* v. *Oshkosh & Miss. R. R. Co.*

In *Lorman* v. *Benson*, 8 Mich. 18, it is held that the riparian owner is entitled to every right consistent with the public easement; and in *Rice* v. *Ruddiman*, 10 Mich. 125, it was held that the riparian owner's title extended into the lake as far as it was susceptible of private use. For this the United States had got an increased price for the land. And it is queried whether the State could cut him off from the water.

In *Barron & Craig* v. *The Mayor & City Council of Baltimore*, 2 Amer. Jurist, 203, it was held that the owner had the right of access to his land by water, and that this was property.

Some of these cases arose on the large rivers and lakes of the West. But the principle must be the same. There is no use of referring to many of the cases where it has been held that no private person has a right to do anything to injure or take away

the access of the riparian owner to his land.   In *Rose* v. *Groves*, 5 M. & G. 613, the plaintiff, who had a house on the bank of a navigable river, recovered for the injury done him by the defendant in placing timber in his front.   They have, however, an important bearing as recognizing that a riparian owner has rights, from the very fact of his being such owner, which are valuable, and, if so, constitute a species of property of which no one can legally deprive him, subject, of course, to the public rights of navigation, &c., and to be regulated by the legislature so as to protect them.

By the Thames Conservancy Act of A. D. 1857, the conservators of the Thames might license any riparian owner to make any dock, basin, or embankment in front of his land into *the body of the river*, with a proviso that it should not abridge or take away any right, franchise, &c., &c., to which any owner of lands on the banks of the river is now by law entitled.   In *Lyon* v. *Fishmongers' Company*, the defendant under license was embanking in such a way as to cut off a portion of the access which the plaintiff had before enjoyed to his wharf, and he prayed for an injunction.   The defendant did not claim a right to interfere with the plaintiff's proper frontage on the river ; but, from the peculiar shape of the shore, he had enjoyed a double frontage, west as well as south.   Malins, V. C., granted an injunction.   L. R. 10 Ch. App. 681, n.   The case was appealed, and the Lords Justices reversed his decision.   L. R. 10 Ch. App. 679, 687.   The justices base their decision on the ground that there was no violation of any private right of the riparian owner distinct from the public right of navigation, and that they could find no authority for holding that on tidal rivers the riparian owner had any rights or easements similar to those which belonged to an owner above the flow of the tide.   The House of Lords, L. R. 1 App. Cas. 662, reversed the decision of the Lords Justices, and opinions of considerable length were delivered by Cairns, Lord Chancellor, and Chelmsford and Selborne, ex-Chancellors.   They all hold most explicitly that the right of the riparian owner does not depend merely on the fact that he suffers a particular damage from a public nuisance, but that he has, as in case of a highway, certain rights distinct from those of the general public, which are valuable and cannot be infringed.   It is not a right held in

common with the rest of the public, for the other members of the public have no access to or from the river at that particular place. It is a form of enjoyment of the land, and of the river in connection with the land, the disturbance of which may be vindicated in damages or restrained by injunction. See also *Attorney General* v. *Conservators of the Thames*, 1 Hem. & M. 1, where the same law is laid down by Page-Wood, V. C.

In *Baltimore & Ohio R. R. Co.* v. *Chase*, 43 Md. 23, it was held that the riparian owner on navigable water has the right of access from the front of his lot, and to erect wharves, &c., subject to regulation by the legislature; that these rights are property; and while they must be enjoyed in subjection to the rights of the public, the owner cannot be deprived of them.

So, in our sister State of Connecticut, it was laid down by Judge Swift, that while the sea and navigable waters are common for certain purposes, the owners of the bank have a right to the soil covered with water as far as they can occupy, that is, to the channel. It was subsequently explained that this does not mean that the riparian owners are seised, but only that they have a right to occupy, and that it is properly termed a franchise. The usage to wharf out is recognized as an immemorial usage, which makes a common law. It exclusively belongs to the riparian owner, and no one has any right to do anything to his injury in front of his land. 1 Swift's System, cap. 22, p. 341; *East Haven* v. *Hemingway*, 7 Conn. 186; *Chapman* v. *Kimball*, 9 Conn. 38; *Nichols* v. *Lewis*, 15 Conn, 137; *Simons* v. *French*, 25 Conn. 346, 352.

The right to wharf out has also been generally recognized in the other States. See the cases and reasoning in a very able opinion in *Clement* v. *Burns*, 43 N. H. 609, 617; and Mr. Justice Dillon, in *Northwestern Union Packet Co.* v. *Atlee*, 2 Dillon, 479, 485, says: "Structures of the character just named (that is, wharves and landing places) connected with the shore, when not erected in violation of legislative regulations, when they do not obstruct the paramount right of navigation, and are not nuisances in fact, have the sanction of long usage in this country, and under the qualifications suggested may be lawfully erected; but the right it is said must be understood as terminating at the point of navigability."

And in the Scotch law it is held, while the riparian owner's absolute right extends only to high water he has a modified property below it, and that no one can interfere between him and the shore.   Bell's Dict. and Digest.

That it may sometimes be a nice question as to when the right of the riparian owner is to be held to conflict with the rights of the public, is no sound reason for denying the right.   In the language of Best, J., in *Blundell* v. *Catterall*, 5 B. & A. 268, 277, " The law in these, as in all other cases, limits and balances opposing rights, that they may be so enjoyed as that the exercise of one is not injurious to the other."

That where land is reclaimed from the tide-waters it may be held, at least to a certain extent, as private property, cannot well be doubted.   *Bell* v. *Gough*, 23 N. J. Law, 624.

The next question, and a very important one, is whether the person having the right to wharf out or to fill up can convey this right separate from the upland.   If the street can be held as a street by estoppel, there is no reason whatever why the same doctrine should not be applied to the lots then under water. The street is laid out for the lots and not the lots for the street. Unless the lots then under water were to be filled, the street would have been of little or no value.   The right has been recognized in many States without any reference to the principle of estoppel.

The original proprietors of Providence conveyed thatch rights to persons not owners of the upland, as we have stated.   In Massachusetts, under their Colony Ordinance of 1640, which as I have before said was probably only designed to recognize and limit an existing usage, the riparian owner had a qualified right to low-water mark, provided it was not more than one hundred rods, and a man might sell these flats separately.   *Adams* v. *Frothingham*, 3 Mass. 352 ; *Valentine* v. *Piper*, 22 Pick. 85 ; *Mayhew* v. *Norton*, 17 Pick. 357.   See also *Storer* v. *Freeman*, 6 Mass. 435 ; *Knight* v. *Wilder*, 2 Cush. 199 ; *Dunlap* v. *Stetson*, 4 Mason, 349 ; *Bowman's Devisees & Burnley* v. *Wathen*, 2 McLean, 376, 384, 389; *Simons* v. *French*, 25 Conn. 346, 352 ; *Deering* v. *Long Wharf*, 25 Me. 51 ; *Chapman* v. *Kimball*, 9 Conn. 38 ; *Nichols* v. *Lewis*, 15 Conn. 137.   So in *East Haven* v. *Hemingway*, 7 Conn. 186, 202, the right to wharf out is

recognized as of immemorial usage, and it is held that this right of occupation is properly a franchise. So also in *Simons* v. *French*, 25 Conn. 346, 352.

As to the doctrine of dedication, it is pretty difficult to understand how anything can dedicated which cannot be used for the purpose intended. Here the land was under water. But if the water lots were validly conveyed, the right in their owners to fill up the street seems to follow; and the owners of those lots, as well as all the owners of lots on the plat, might well be held to be estopped from denying it to be a highway.

As to the effect of unity of possession, the argument of the respondents that the purpose of this street was to provide a way for lots 13 to 22 would, it seems to me, from their location on the plat, be entitled to great force but for the language of the instrument attached to the plat, which declares expressly that all the squares, streets, and easements are attached to each lot.

*Decree accordingly.*

The case was subsequently tried before a jury to determine the validity of the third defence set up by the respondents, that of twenty years' uninterrupted, peaceful, and exclusive possession. November 14, 1879, the jury gave a verdict for the respondents.